# United States Court of Appeals
## For the First Circuit

No. 07-1384

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff, Appellant,

v.

JAMES TAMBONE; ROBERT HUSSEY,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Selya and Lipez, Circuit Judges,
and Delgado-Colón,* District Judge.

John W. Avery, Senior Litigation Counsel, Securities and Exchange Commission, with whom Andrew N. Vollmer, Deputy General Counsel, and Jacob H. Stillman, Solicitor, were on brief, for appellant.
Elliot H. Scherker, with whom Greenberg Traurig, P.A., A. John Pappalardo, John A. Sten, David G. Thomas, D. Greg Blankinship, and Greenberg Traurig, LLP, were on brief, for appellee Tambone.
Christopher M. Joralemon, with whom Warren L. Feldman, Clifford Chance US LLP, Frank A. Libby, Jr., John J. Commisso, and Kelly, Libby & Hoopes, P.C., were on brief, for appellee Hussey.

December 3, 2008

*Of the District of Puerto Rico, sitting by designation.

**LIPEZ**, **Circuit Judge**. In this enforcement action brought by the Securities and Exchange Commission ("SEC" or "the Commission"), the Commission seeks to hold defendants James R. Tambone and Robert Hussey, executives of Columbia Funds Distributor, Inc., the primary underwriter for the Columbia family of mutual funds, responsible both as primary violators of the federal securities laws and as aiders and abettors of uncharged primary violations of Columbia Advisors and/or Columbia Distributor.[1] After carefully reviewing the relevant statutes and precedents, we conclude that Tambone and Hussey may be held primarily liable for using false or misleading fund prospectuses to sell mutual fund shares under Section 17(a)(2) of the Securities Act of 1933 ("section 17(a)(2)") and Section 10(b) of the Exchange Act of 1934 ("section 10(b)"), and its implementing regulation, Rule 10b-5. Additionally, we conclude that the scope of conduct encompassed by section 17(a)(2)'s prohibition on obtaining money or property "by means of" any untrue statement of material fact may, in certain circumstances, be broader than Rule 10b-5(b)'s prohibition against "making" an untrue statement. Here, however,

_____

[1] The provisions at issue in this case are Sections 10(b) and 15(c) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and § 78o(c), respectively, along with Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated under section 10(b); Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a); and Sections 206(1) and (2) of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-6(1), (2).

we conclude that the SEC's second complaint[2] alleges with sufficient particularity violations of both prohibitions by Tambone and Hussey, as well as aiding and abetting violations. We therefore reverse the district court's judgment dismissing the SEC's complaint against Tambone and Hussey.

## I.

### A. The Roles of the Defendants

The following description of the alleged conduct, drawn primarily from the SEC's second complaint, is presented in the light most favorable to the plaintiff. Miss. Pub. Employees' Ret. Sys. v. Boston Scientific Corp., 523 F.3d 75, 85 (1st Cir. 2008).

During the relevant time period, defendants Tambone and Hussey were senior executives of Columbia Funds Distributor, Inc. ("Columbia Distributor"), a broker-dealer registered with the SEC since 1992. Between 1998 and 2003, the company was the principal underwriter and distributor for a group of approximately 140 mutual funds ("the Columbia Funds") and, in that capacity, was primarily responsible for selling those securities and disseminating informational materials on the funds, including prospectuses, to investors and potential investors.[3] See 15 U.S.C. § 80a-

---

[2] We review the district court's dismissal of the SEC's second complaint. The SEC's first complaint against defendants was dismissed without prejudice before the Commission had an opportunity to amend it with additional related allegations.

[3] Although a mutual fund may sell shares directly to broker-dealers, it typically employs a principal underwriter to distribute

2(a)(40) (describing the duties of an underwriter to include purchasing securities from an issuer for resale, or selling securities for an issuer).  Columbia Distributor was also responsible for answering inquiries from the investing public and other entities seeking additional information about any of the Columbia Funds.  Columbia Distributor and the issuer of the funds, Columbia Advisors, a registered investment adviser, were both wholly-owned subsidiaries of Columbia Management Group, Inc. and indirect subsidiaries of FleetBoston Financial Corporation.[4]

As issuer and sponsor, Columbia Advisors was primarily responsible for creating the content of the prospectuses for the Columbia Funds.  See 15 U.S.C. § 80b-2(a)(11) (defining an investment adviser as "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling

and market the fund to broker-dealers and to the investing public.

[4] Columbia Distributor previously went by the name Liberty Funds Distributor, Inc.  In November 2001, FleetBoston Financial Corporation purchased Liberty Financial Group and acquired various Liberty fund groups and investment advisers, including Liberty Advisory Services Corp., Colonial Management Associates, Inc., Stein Roe and Farnham Inc., Newport Pacific Management, Inc., Newport Fund Management, Inc. and Columbia Funds Management Company. Fleet retained the organization and management of Liberty Distributor and continued using the Liberty name on the prospectuses for the Liberty Funds.  These entities merged in April 2003 with Fleet Investment Advisors, Inc. into Columbia Advisors. In April 2004, Bank of America Corporation became the successor to Fleet.

securities"). Columbia Fund Services, Inc. ("Columbia Services"), also a subsidiary of Columbia Management Group, was responsible for determining whether "market timing" activities were occurring in the Columbia funds and responding to such activity. Market timing refers to the practice of buying and selling mutual funds in rapid succession to exploit short-term inefficiencies in the pricing of the funds.[5] Among the specific Columbia Funds pertinent to this case were the Acorn Fund Group, the Newport Tiger Fund, the Columbia Growth Stock Fund, and several others.

Beginning in 1997, Tambone, a registered securities principal,[6] was employed as Co-President of Liberty Distributor, and later Columbia Distributor, where he was one of the executives responsible for managing all of Columbia Distributor's activities, including the fulfillment of its obligations as underwriter of the

---

[5] Market timing is "a mutual fund trading strategy that 'exploit[s] brief discrepancies between the stock prices used to calculate the shares' value once a day, and the prices at which those stocks are actually trading in the interim." SEC v. Ficken, 2008 WL 4615797, at *1 (1st Cir. Oct. 20, 2008) (quoting Kircher v. Putnam Funds Trust, 547 U.S. 633, 637 n.4 (2006)). "The discrepancy occurs because the value of the fund is calculated only once each day." SEC v. Druffner, 517 F. Supp. 2d 502, 506 (D. Mass. 2007).

[6] A registered securities principal is one who has been certified by the Financial Industry Regulatory Authority ("FINRA") to "manage or supervise [a member entity's] investment banking or securities business for corporate securities, direct participation programs, and investment company products/variable contracts." See FINRA Registration and Examination Requirements, http://www.finra.org/RegistrationQualifications/BrokerGuidanceRes ponsibility/Qualifications/p011051 (last visited Dec. 3, 2008).

Columbia Funds.  These duties included the sale and marketing of the Columbia Funds and the dissemination to investors of the fund prospectuses and other materials.  As Co-President, Tambone was at times involved in the process of revising the prospectuses, although the SEC does not allege that he was responsible for drafting them.

Hussey served as Senior Vice President of the Alliance Group at Liberty Distributor from 1998 until 2000, where he was responsible for selling funds to investment advisers and others for the benefit of their clients.  In 2000, he became Liberty Distributor's Managing Director for National Accounts.  In that capacity, he managed the sale of the funds to broker-dealers and other entities.  Hussey held the same position, with substantially similar responsibilities, at Columbia Distributor from January 2002 until March 2004.  Throughout this period, Hussey reported directly to Tambone.  Both Tambone and Hussey thus played substantial and direct roles in the sale and distribution of securities, and, according to the complaint, more than half of the total compensation that defendants received each year consisted of commissions from fund sales.

## B. The Nature of the Alleged Wrongdoing

Between 1998 and 2003, various Columbia Funds adopted disclosure statements in their mutual fund prospectuses addressing market timing practices engaged in by fund investors.  The market

timing practice of rapidly shuffling an investment into and out of certain targeted funds is known as engaging in "round-trips." Although potentially beneficial to an individual investor, and not per se illegal, round-trips and other market timing practices can adversely affect mutual fund shareholders because the profits obtained from market timing practices dilute the value of shares in the fund held by long-term shareholders. Further, round-trips increase a fund's trading costs (which are borne by all shareholders), and may cause the mutual fund to realize capital gains at inopportune times. To prevent such practices, language was inserted into many of the Columbia Fund prospectuses limiting the number of round-trips -- specifically, an exchange from one fund to another and then back again -- a shareholder could engage in during a given period.[7] As market timing practices became more prevalent, Columbia took additional steps to prevent such behavior. In May 1999, certain of the prospectuses for the funds belonging to the Acorn Fund Group began representing that "[t]he Acorn funds do not permit market timing and have adopted policies to discourage this practice."

Consistent with the goal of limiting market timing behavior, Hussey, in 2000, co-led a working group that recommended that all of the Columbia Funds adopt a consistent position against

---

[7] For example, from 1998 through 2000, the prospectuses for the funds within the Acorn Fund Group stated that investors would generally be permitted to make up to four round-trips per year.

such practices in their prospectuses. The complaint states, based on information and belief, that in April and May 2000, Hussey and Tambone each reviewed drafts of the market timing representations to be included in the prospectuses and offered comments via e-mail to the in-house counsel for Columbia Advisors. Months later, a number of the Columbia Funds revised their prospectuses to include a statement prohibiting market timing (the "Strict Prohibition").[8] By the spring of 2001, the remaining Columbia Funds belonging to Liberty had also adopted the Strict Prohibition language in their prospectuses. That language remained in these funds' prospectuses until at least 2003, and was later added to prospectuses for funds previously owned by Fleet before the acquisition.

The SEC alleges that, concurrent with these amendments, defendants affirmatively approved or knowingly allowed frequent trading in particular mutual funds in violation of the Strict Prohibition disclosures contained in their prospectuses. The Commission's second complaint details six arrangements that Tambone

---

[8] The Strict Prohibition read:

The fund does not permit short-term or excessive trading in its shares. Excessive purchases, redemptions or exchanges of Fund shares disrupt portfolio management and increase Fund expenses. In order to promote the best interests of the Fund, the Fund reserves the right to reject any purchase order or exchange request particularly from market timers or investors who, in the advisor's opinion, have a pattern of short-term excessive trading or whose trading has been or may be disruptive to the Fund. The funds into which you would like to exchange may also reject your request.

approved or knowingly allowed and seven arrangements that Hussey approved or knowingly allowed, most, but not all of which, overlapped. We describe the alleged arrangements, none of which were disclosed to the investors or the independent trustees of the Columbia Funds.

(1) Hussey and Tambone approved an arrangement allowing Ilytat, L.P. to engage in frequent and short-term trading in Newport Tiger Fund, a Columbia mutual fund. According to the arrangement, Ilytat would place $20 million in the Newport Tiger Fund, with two-thirds remaining static and one-third being actively traded. Tambone approved or became aware of the arrangement by October 2000, when the portfolio manager for the Newport Tiger Fund, who had initially approved the arrangement, communicated to both Tambone and Hussey his concern about Ilytat's market timing practices and the potential harm it could have on the fund and its investors.[9] With Hussey's approval, Ilytat was added to Columbia

---

[9] In response to an email from the Newport Tiger Fund's portfolio manager in October 2000 discussing Ilytat, in which the manager states that "their active trading has increased and it has become unbearable. There will be long term damage to the fund," Hussey set forth guidelines for such market timing arrangements, including:

- Identify and close a long-term asset stream as a quid-pro-quo to any short-term movements;
- Dictate that any short-term movements must use a Liberty money market option to ensure gross sales are not artificially inflated and to ensure that Liberty generates constant management fee income;
- Bring the potential relationship to the attention to [sic] the relevant investment management team

-9-

Services' list of "Authorized Accounts for Frequent Trading,"[10] and Hussey, in 2002, reversed a stop placed on Ilytat's trading by Columbia Services market timing surveillance personnel.

In total, between April 2000 and October 2002, Ilytat made 350 round-trips in seven international Columbia Funds, including the Newport Tiger Fund and the Acorn International Fund. At least 30 of the round-trips in the Newport Tiger Fund were made during the period from May 2001 through September 2002 when the fund prospectus contained the Strict Prohibition representation.[11] Moreover, despite language in the prospectus for the Acorn International Fund between September 1998 and September 2000 preventing investors from engaging in more than four round-trips per year, Ilytat engaged in 27 such round-trips in 1999 and 18 in 2000. Ilytat also engaged in at least 20 round-trips in the fund between July 2000 and June 2001, when the fund prospectus included the Strict Prohibition language.

---

early; and
- Monitor the relationship to ensure the investment management team's comfort.

Hussey's response, which was copied to Tambone, stated that the Ilytat arrangement followed these guidelines.

[10] The list was designed to protect certain entities from any internal actions taken to prevent market timing practices.

[11] In 2000 and early 2001, before it was amended to include the Strict Prohibition, the prospectus for the Newport Tiger Fund stated that "[s]hort term 'market timers' who engage in frequent purchases and redemptions can disrupt the Fund's investment program and create additional transaction costs that are borne by all shareholders."

(2) From January 2000 through September 2003, Ritchie Capital Management, Inc. traded frequently in a number of Columbia Funds, including the Newport Tiger Fund and the Columbia Growth Stock Fund. In late 2001, Hussey became aware of Ritchie's short-term trading activities in the two Columbia Funds. In early 2003, Ritchie Capital Management, Inc. entered into an arrangement with Columbia Distributor, approved by Tambone and Hussey, designating certain of Ritchie's investments as "sticky assets,"[12] or long-term assets, and others as available for short-term trading.

(3) In late 2002 or early 2003, Edward Stern entered into two separate agreements with Columbia Distributor through intermediaries. One arrangement, secured by Epic Advisors on behalf of Stern's Canary Investment Management firm, and approved by Tambone, allowed Stern entities to make three round-trips per month in each of three Columbia funds. Each fund's prospectus contained the Strict Prohibition language. The second agreement involved the placement of $5 million in the Columbia High Yield Fund, whose prospectus also contained the Strict Prohibition disclosure. That arrangement, approved by the fund's portfolio manager, permitted Stern to make one round-trip each month.

---

[12] "Sticky assets" are investment assets that remain in place within a given fund for an extended period of time. A "sticky asset" arrangement typically involves keeping these "sticky assets" in place for a given period of time in return for permission to actively trade another amount of assets more frequently.

(4)   In 1999, Daniel Calugar was allowed to place up to $50 million in the Columbia Young Investor Fund and the Columbia Growth Stock Fund, with permission to make one round-trip per month with the entire amount.  In 2000, knowing that Calugar was trading at levels exceeding their arrangement, Hussey expressed concern that Calugar's activities were harming the funds, but took no action to limit the trading activities.  Tambone was apprised by Hussey of Calugar's activities, but also took no action.  Calugar continued the short-term trading activities until at least August 2001, several months after the funds at issue adopted the Strict Prohibition language in their prospectuses.

(5)   Tambone approved a "sticky asset" arrangement between Columbia Distributor and broker Sal Giacalone in late 2000.  Per the terms of the arrangement, Giacalone was allowed to make four round-trips per month of up to $15 million in the Newport Tiger Fund so long as he also placed $5 million in the long-term assets of the Acorn Fund.  Between November 2000 and April 2001, Giacalone made a total of 43 round-trips in the Newport Tiger Fund pursuant to the arrangement.

(6)   Hussey approved an arrangement with D.R. Loeser in late 1998 allowing Loeser to make five round-trips per month of up to $8 million in the Columbia Growth Stock Fund.  In the first five months of 2000, Loeser made approximately 20 round-trips in the Growth Stock Fund and another 20 round-trips in the Young Investor

-12-

Fund. Despite knowledge by Tambone and Hussey of Loeser's trading practices, neither took action to halt the trading activities.

(7) Signalert entered into an arrangement with Columbia Distributor in 1999, approved by Hussey, in which it agreed to invest $7.5 million in the Growth Stock Fund and $7.5 million in the Young Investor Fund in exchange for permission to engage in 10 round-trips annually in each of the funds. Pursuant to the arrangement, Signalert was also required to place $5 million in each of six other funds, which could be traded just once each quarter. During 2000-2001, Signalert made over 50 round-trips in the Growth Stock Fund and approximately 50 round-trips in the Young Investor Fund. These included 20 round-trips in the Young Investor Fund between February and August 2001, after the fund's prospectus had been amended to include the Strict Prohibition language.

(8) In early 2000, Columbia Distributor agreed to allow Tandem Financial to make an unlimited number of trades in one or more of the Columbia Funds. During the period from April 2001 through September 2003, Tandem made 106 round-trips in the Columbia Tax Exempt Fund, despite the Strict Prohibition disclosure in the fund prospectus. Hussey and one of Tambone's subordinates became aware of Tandem's activities in early 2003.

The complaint alleged that Columbia Advisors, itself or through portfolio managers for the separate funds, knew or approved of all of the market timing arrangements, except the arrangement

-13-

with Tandem.  In total, during the approximately five-year period from 1998 to 2003, hundreds of round-trips were executed in the Columbia Funds in amounts approaching $2.5 billion.

Meanwhile, in his position as Managing Director for National Accounts, Hussey also helped lead a task force established to develop procedures for detecting and preventing market timing activities in the Columbia Funds.  Hussey was the designated contact for inquiries about market timing, including what actions, if any, should be taken if such activity was detected.  In this capacity, he participated in the creation of a list of "Accounts Approved for Frequent Trading."[13]  According to the second complaint, both Hussey and Tambone, on multiple occasions, blocked or allowed their subordinates to block efforts to halt the trading activity of preferred customers.

In addition to overseeing the distribution of prospectuses, Tambone, on behalf of Columbia Distributor, signed hundreds of selling agreements for Columbia Funds during this

---

[13] The complaint describes an email forwarded to Hussey by the market timing surveillance manager describing the differential treatment given to favored investors:

I review 3 different reports each day that reflect accounts fitting this criteria [the definition of market timers].  After these accounts are located, I take action against some of them.  The accounts that are recognized as timers (that do not have some kind of existing relationship with us) merit trade cancellations and placement of account stops.  The accounts that are allowed to trade (due to a sales relationship) are ignored.

-14-

period.  Each selling agreement stated the procedures by which the customer would purchase shares of the Columbia Funds from Columbia Distributor and contained express representations and warranties related to the content of the prospectuses.  Tambone referred the purchaser to the fund prospectuses for information on the fund and specifically stated in each agreement that "[w]e shall furnish prospectuses and sales literature upon request."

The SEC learned of the alleged conduct of defendants and the various Columbia entities during the course of its investigation of market timing practices of many fund companies. See Gretchen Morgenson & Landon Thomas, Jr., S.E.C. Finding Fund Abuses, Official Says, N.Y. Times, Oct. 25, 2003, at C1 ("[A]fter sending out 88 letters to mutual fund companies and brokerage firms, [the SEC] found that half . . . had arrangements with one or more investors allowing them to trade in and out of shares.  These arrangements occurred even though about half of the fund companies have policies specifically barring market timing, the official said.").  Prior to filing its initial complaint in this case, the Commission obtained extensive discovery from Columbia, reviewing hundreds of thousands of pages in documents and taking the sworn testimony of Mr. Hussey and over 20 other witnesses.[14]

---

[14] Section 21 (a)(1) of the Securities Exchange Act of 1934 gives the SEC broad authority to "make such investigations as it deems necessary to determine whether any person has violated, is violating, or is about to violate any provision of [the Exchange Act and] the rules or regulations thereunder . . . ."  15 U.S.C. §

## C. Procedural History

The SEC filed a complaint against defendants Tambone and Hussey in February 2005 alleging securities fraud based on the above allegations.[15] The complaint alleged that defendants committed primary acts of fraud in violation of section 10(b) of the Securities Exchange Act, Rule 10b-5, and section 17(a)(2) of the Securities Act. It also alleged that defendants aided and abetted primary violations committed by Columbia Advisors and Columbia Distributor in violation of section 206 of the Advisers Act, and primary violations committed by Columbia Distributor in violation of section 15(c)(1) of the Exchange Act. The complaint sought three remedies: (1) a permanent injunction to restrain Tambone and Hussey from further violating, either directly or indirectly, the statutory provisions implicated in this case; (2)

---

78u(a)(1).

[15] In February 2005, the SEC settled an enforcement action against Columbia Advisors, Columbia Distributor, and three former Columbia executives related to undisclosed market timing arrangements in the Columbia Funds. Without admitting or denying the SEC's findings, Columbia Advisor and Columbia Distributor agreed to pay $70 million in disgorgement and a civil penalty of $70 million to the SEC, to be distributed to investors harmed by the conduct. Press Release, U.S. Securities and Exchange Commission, Fleet's Columbia Mutual Fund Adviser and Distributor to Pay $140 Million to Settle SEC Fraud Charges for Undisclosed Market Timing, 2005-15 (Feb. 9, 2005) (available at http://www.sec.gov/news/press/2005-15.htm). As a result, the SEC's claims in this case are targeted at Tambone and Hussey only, although to establish aiding and abetting liability against these defendants, the SEC is also required to allege claims against Columbia Advisors and/or Columbia Distributor for primary violations of the securities laws.

disgorgement and pre-judgment interest; and (3) unspecified civil penalties.  See 15 U.S.C. §§ 77t(d), 78u(d)(3), and 80b-9(e).

The defendants moved to dismiss the complaint for failure to plead fraud with particularity as required by Fed. R. Civ. P. 9(b) and for failure to state a claim upon which relief could be granted under Rule 12(b)(6).  The district court granted the motions without prejudice on January 27, 2006.

On March 16, 2006, the SEC moved for leave to amend the original complaint.  Before that motion was resolved, the SEC moved for relief from judgment pursuant to Fed. R. Civ. P. 60(b), having realized that a motion for leave to amend cannot be considered after a case has been dismissed.  The district court denied both motions on May 5, 2006.

On May 19, 2006, the SEC filed a second complaint which sought the same remedies but raised an additional aiding and abetting offense and offered supplemental factual allegations to support all of the claimed violations.  As characterized by the district court, the Commission's second complaint contained 110 paragraphs nearly identical to those in the initial complaint, and twelve additional paragraphs alleging new facts.  The additional paragraphs state generally that both defendants participated in the review and oversight processes related to market timing issues for the Columbia Funds, and specifically allege that defendants were responsible for misrepresentations on market timing in the fund

-17-

prospectuses.[16]  Despite these additions, the district court again dismissed the Commission's claims on December 29, 2006, this time with prejudice.

Addressing the question of primary liability, the court applied an attribution test.  That is, the court stated that to be liable under "Section 10(b) of the Exchange Act and Section 17(a) of the Securities Act, a defendant must have personally made either an allegedly untrue statement or a material omission."  Despite the SEC's allegations that defendants had participated in working groups and task forces that led to the revision of the market timing statements in the false and misleading prospectuses, and then used those prospectuses to sell the mutual funds, the court concluded that "[t]he major flaw with the SEC's complaint was then, and continues to be, a failure to attribute misleading statements to either Tambone or Hussey."  According to the district court, neither the defendants' roles in disseminating the allegedly misleading prospectuses nor their participation in the process of revising the disclosures was sufficient to satisfy the provisions' attribution requirement.

The court also found other deficiencies in the SEC's complaint.  First, the court ruled that the SEC had failed to satisfy the pleading particularity requirements imposed by Fed. R.

---

[16] From this point forward in the opinion, we shall refer to the second complaint as "the complaint."

Civ. P. 9(b), noting that "[t]he new paragraphs fail [] to identify the substance of the comments made by either Tambone or Hussey . . . and . . . fail to allege that any of the language reviewed or proposed by either defendant was ever actually incorporated into the fall 2001 prospectus." Second, the court rejected the Commission's allegation that Tambone and Hussey owed a duty to the investors to whom they sold the funds. It wrote: "[A]n individual owes a duty to clarify a misleading statement only if that statement is attributable to the individual." Without any statement attributable to them, the defendants could not be held liable for misleading statements or omissions in the prospectuses, nor for failing to correct the false prospectuses.

Finally, the court dismissed the SEC's aiding and abetting allegations, finding that the "SEC had not sufficiently alleged that the defendants consciously threw in their lot with the primary violators."

The SEC challenges these conclusions of the district court on appeal.

## II.

We review the district court's grant of a motion to dismiss de novo. Rodríguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95 (1st Cir. 2007). Although Fed. R. Civ. P. 8(a)(2) requires only "a short and plain statement of the claim" sufficient to give the defendant fair notice of the claim and its factual basis, see

Conley v. Gibson, 355 U.S. 41, 47 (1957), the "plain statement" must "possess enough heft to 'sho[w] that the pleader is entitled to relief.'" Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1966 (2007) (quoting Fed. R. Civ. P. 8(a)(2)). A plaintiff's task "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." Id. at 1965; see also Rodríguez-Ortiz, 490 F.3d at 95.

When reviewing a ruling on a motion to dismiss under Rule 12(b)(6), we accept all well-pleaded facts as true and draw all reasonable inferences in favor of the plaintiff. ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 58 (1st Cir. 2008). We are not limited to the district court's reasoning, but "may affirm an order of dismissal on any basis made apparent by the record." Ramos-Pinero v. Puerto Rico, 453 F.3d 48, 51 (1st Cir. 2006).

The SEC must also satisfy the heightened pleading standard set by Fed. R. Civ. P. 9(b) for allegations of fraud. The heightened standard applies both where fraud is an essential element of the claim, as in the Commission's claims under section 10(b), and where the plaintiff alleges fraud even though it is not a statutory element of the offense, as in the SEC's claims under section 17(a)(2). Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1223 (1st Cir. 1996) ("It is the allegation of fraud, not the 'title' of the claim that brings the policy concerns [underlying Rule 9(b)] . . . to the forefront." (quoting Haft v. Eastland Fin. Corp., 755 F.

-20-

Supp. 1123, 1133 (D.R.I. 1991))); see also ACA Fin., 512 F.3d at 68. Rule 9(b) mandates that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."[17] Fed. R. Civ. P. 9(b). "Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Id. To satisfy the particularity element, we require that the Commission's complaint include the "time, place, and content of the alleged misrepresentation with specificity." Greebel v. FTP Software, Inc., 194 F.3d 185, 193 (1st Cir. 1999). Further, "[w]here allegations of fraud are explicitly or . . . implicitly[] based only on information and belief, the complaint must set forth the source of the information and the reasons for the belief." Romani v. Shearson, Lehman, Hutton, 929 F.2d 875, 878 (1st Cir. 1991).

To establish scienter, we ordinarily require that a plaintiff allege sufficient facts to give rise to a "strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); see also ACA Fin., 512 F.3d at 58-59. We developed this heightened standard in the context of private securities actions "to minimize the chance 'that a

---

[17] Since the SEC filed its complaint, Rule 9(b) "has been amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules." We recite the text of the old version of the rule. The changes were "intended to be stylistic only." Fed. R. Civ. P. 9 advisory committee's notes (2007 amendment).

plaintiff with a largely groundless claim will bring a suit and conduct extensive discovery in the hopes of obtaining an increased settlement, rather than in the hopes that the process will reveal relevant evidence,'" Shaw, 82 F.3d at 1223 (quoting Romani, 929 F.2d at 878), and it was largely codified by Congress in the Private Securities Law Reform Act of 1995 ("PSLRA"). See ACA Fin., 512 F.3d at 58 n.7 (noting that our prior application of Fed. R. Civ. P. 9(b) to allegations of scienter in private securities fraud actions is consistent with the standard imposed by the PSLRA); Greebel, 194 F.3d at 193 ("The PSLRA's pleading standard is congruent and consistent with the pre-existing standards of this circuit.").

Here, however, we are evaluating a securities complaint filed by the SEC, not a private actor. Therefore, on its face, the requirements of the PSLRA do not apply. Additionally, the rationales we set forth for a more demanding standard in private securities actions do not apply to this SEC enforcement action. Whereas private parties have a financial incentive to initiate "strike" suits and drag deep-pocketed defendants into court on allegations of fraud in hopes of obtaining a lucrative settlement, the SEC's statutory task is to protect the investing public by policing the securities markets and preventing fraud. Moreover, as noted above, the SEC possesses the authority to investigate conduct prior to filing a complaint, thereby minimizing the

-22-

concerns that may result from a lengthy and intense discovery process.  See 15 U.S.C. § 78u(a)(1); cf. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71, 80-81 (2006) (noting that the standard for establishing a claim under section 10(b) is higher in the context of a private suit than in an SEC enforcement action because courts are rightly concerned with limiting the "vexatiousness" associated with private Rule 10b-5 suits). Therefore, the additional scrutiny applied to allegations of scienter in private securities fraud complaints is unwarranted in this case.  See, e.g., SEC v. Lucent Techs., Inc., 363 F. Supp. 2d 708, 717 (D.N.J. 2005) ("[T]he heightened requirements for pleading scienter under the PSLRA do not apply to actions brought by the SEC."); SEC v. ICN Pharm., Inc., 84 F. Supp. 2d 1097, 1099 (C.D. Cal. 2000) ("[T]he 'more rigorous' pleading requirements under the PSLRA, which go beyond the Rule 9(b) requirements only apply to private securities fraud actions; they do not apply to a case . . . brought by the SEC.").  Of course, the ordinary scienter requirements of Rule 9(b) apply.  The SEC need only allege scienter generally.  Fed. R. Civ. P. 9(b).

Although we decline to apply the "strong inference" requirement of the PSLRA, we rely on the method elucidated recently by the Supreme Court to assess whether scienter has been adequately alleged.  See Tellabs, Inc. v. Makor Issues & Rights,

-23-

<u>Ltd.</u>, 127 S.Ct. 2499, 2509 (2007).[18]  Accordingly, we evaluate "the complaint in its entirety" to determine "whether <u>all</u> of the facts alleged, taken collectively" meet the scienter standard.  <u>Id.</u> Further, we conduct a fact-specific inquiry that considers the circumstances and allegations of the particular case, rather than relying on a generalized pattern of facts as evidence of motive and opportunity.  <u>Greebel</u>, 194 F.3d at 196 ("The categorization of patterns of facts as acceptable or unacceptable to prove scienter or to prove fraud has never been the approach this circuit has taken to securities fraud."); <u>In re Cabletron Sys., Inc.</u>, 311 F.3d 11, 32 (1st Cir. 2002) ("Each securities fraud complaint must be analyzed on its own facts; there is no one-size-fits-all template.").

**III.**

**A. Statutory Background**

We begin our analysis of the SEC's claims with the text, history, and purpose of the provisions at issue.  <u>See</u> <u>Ernst &</u> <u>Ernst</u> v. <u>Hochfelder</u>, 425 U.S. 185, 197 (1976) ("[t]he starting point in every case involving construction of a statute is the language itself." (quoting <u>Blue Chip Stamps</u> v. <u>Manor Drug Stores</u>, 421 U.S. 723, 756 (1975) (Powell, J., concurring))).  The

---

[18] In <u>Tellabs</u>, the Supreme Court was faced with the question of how to assess whether a private securities complaint alleged sufficient facts to establish a "strong inference" of scienter against the defendant, as required by the PSLRA.

Securities Act of 1933 and the Exchange Act of 1934 were enacted to "set the economy on the road to recovery" after the 1929 stock market crash and reports of widespread fraud and abuse in the securities industry. United States v. Naftalin, 441 U.S. 768, 775 (1979); see also Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 170-71 (1994). Together, the acts promote this goal by prohibiting fraud through a scheme of civil and criminal[19] liability and "substitut[ing] a philosophy of full disclosure for the philosophy of caveat emptor." SEC v. Capital Gains Research Bureau, 375 U.S. 180, 186 (1963). Although the Securities Act was primarily concerned with the regulation of new offerings and the Exchange Act with post-distribution trading, section 17(a) of the Securities Act "was meant as a major departure" from the scope of the rest of that statute, and was "intended to cover any fraudulent scheme in an offer or sale of securities, whether in the course of an initial distribution or in the course of ordinary market trading." Naftalin, 441 U.S. at 777-78; see also Central Bank, 511 U.S. at 171.

The text of the statutes confirms their common purpose to prohibit a wide swath of fraudulent behavior that Congress believed impeded the smooth and honest functioning of the

---

[19] Criminal penalties may be imposed if an individual or entity is found to have willfully violated section 17(a) of the Securities Act. 15 U.S.C. § 77x; see Naftalin, 441 U.S. at 778 (criminal prosecution under section 17(a)).

-25-

securities markets.  See Naftalin, 441 U.S. at 775-78; Ernst &
Ernst, 425 U.S. at 194.  Section 17(a) was designed to address the
most egregious abuses of securities sellers by authorizing the SEC
to punish violators through injunctive relief or criminal
liability rather than by means of private causes of action.  See,
e.g., SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 867 (2d Cir.
1968) (Friendly, J., concurring) ("[T]here is unanimity . . . that
§ 17(a)(2) of the 1933 Act -- indeed the whole of § 17 -- was
intended only to afford a basis for injunctive relief and, on a
proper showing, for criminal liability . . . ."); see also David
S. Ruder, Civil Liability under Rule 10b-5: Judicial Revision of
Legislative Intent?, 57 Nw.U. L. Rev. 627, 656 (1963) (referencing
the statute's legislative history).  Section 17(a) states:

> It shall be unlawful for any person in the offer or sale
> of any securities . . . by the use of any means or
> instruments of transportation or communication in
> interstate commerce or by use of the mails, directly or
> indirectly
> (1)  to employ any device, scheme, or artifice to
> defraud, or
> (2)  to obtain money or property by means of any untrue
> statement of a material fact or any omission to state a
> material fact necessary in order to make the statements
> made, in light of the circumstances under which they were
> made, not misleading; or
> (3)  to engage in any transaction, practice, or course of
> business which operates or would operate as a fraud or
> deceit upon the purchaser.

15 U.S.C. § 77q(a).  Section 10(b) of the 1934 Act performs a
similar catch-all function and also extends coverage beyond

securities sellers.  <u>See</u> <u>Texas Gulf Sulphur</u>, 401 F.2d at 859-60.

Section 10(b) states:

> It shall be unlawful for any person, directly or indirectly . . . .
> (b) To use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

"Section 10(b) of the Exchange Act bars conduct involving manipulation or deception, manipulation being practices . . . that are intended to mislead investors by artificially affecting market activity, and deception being misrepresentation, or nondisclosure intended to deceive." <u>Ganino</u> v. <u>Citizens Utils. Co.</u>, 228 F.3d 154, 161 (2d Cir. 2000) (quotation marks and citation omitted).  By its literal terms, section 10(b) applies to conduct in violation of rules and regulations issued by the SEC.  Its prohibitions were given effect almost a decade after its enactment with the SEC's adoption of Rule 10b-5, among other rules.  The Rule largely mimics the language of section 17(a) while applying to both the sale and purchase of any security:

> It shall be unlawful for any person, directly or indirectly . . .
> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. The rule "encompasses only conduct already prohibited by § 10(b)." Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 128 S. Ct. 761, 768 (2008); see United States v. O'Hagan, 521 U.S. 642, 651 (1997). Because of its broad scope and its availability to private plaintiffs, Rule 10b-5 "is the most commonly used basis for private suits charging fraud in connection with the purchase or sale of securities." See 3 Thomas Lee Hazen, Treatise on the Law of Securities Regulation § 12.4[1] (5th ed. 2005); see also Ernst & Ernst, 425 U.S. at 196 ("During the 30-year period since a private cause of action was first implied under § 10(b) and Rule 10b-5, a substantial body of case law and commentary has developed as to its elements.") (footnote omitted).

Although the text of section 17(a) is nearly identical to the text of Rule 10b-5, as indeed section 17(a) served as the guide for Rule 10b-5, there are several key distinctions between the provisions. See generally 3 Hazen, supra, § 12.22; see also 15 U.S.C. § 77q; 17 C.F.R. § 240.10b-5. First, whereas section 17(a) applies only to brokers and dealers selling or offering to sell securities, Rule 10b-5 explicitly covers "any person" who commits a fraudulent act "in connection with the purchase or sale

-28-

of any security."[20] See Exchange Act Release No. 3230, 7 Fed. Reg. 3804 (May 21, 1942) (Rule 10b-5 was intended to "close[] a loophole in the protections against fraud administered by the Commission by prohibiting individuals or companies from buying securities if they engage in fraud in their purchase.") (emphasis added); see also 3 Hazen, supra, § 12.22. Moreover, section 10(b) and Rule 10b-5 reach only conduct that "coincides" with a securities transaction -- a sale or purchase, see Merrill Lynch, 547 U.S. at 85 -- and not a fraudulent offer alone.[21] In contrast, because section 17(a) applies to both sales and offers to sell securities, the SEC need not base its claim of liability on any completed transaction at all. See Blue Chip Stamps, 421 U.S. at

---

[20] Rule 10b-5 explicitly modified the language of section 17(a) to create an antifraud prohibition that expanded beyond the sale context. According to Milton Freeman, one of the rule's co-drafters, Rule 10b-5 was hastily drafted and approved in response to a report that the president of a company was buying up his company's stock based on false statements regarding its financial outlook. In an attempt to address this specific situation, Freeman claims to have combined sections 10(b) and 17. Discussion centered on where the phrase "in connection with the purchase or sale" should be located. The Commission quickly approved the provision without any discussion except a statement by Commissioner Sumner Pike to the effect of, "Well, we are against fraud, aren't we?" Milton V. Freeman, Conference on Codification of the Federal Securities Laws: Administrative Procedures, 22 Bus. Law. 891, 922 (1967); see also Blue Chip Stamps, 421 U.S. at 767 (Blackmun, J., dissenting).

[21] In Blue Chip Stamps, the Supreme Court further confined the scope of Rule 10b-5 in the context of private causes of action. 421 U.S. at 731-34. Based on policy concerns, the court held that only actual purchasers or sellers of securities have standing to bring a private cause of action under Rule 10b-5. Id. at 733-35.

733-34 (contrasting the text of section 10(b) with that of section 17(a)); <u>Naftalin</u>, 441 U.S. at 773 (explaining that the statutory terms "offer" and "sale" are "expansive enough to encompass the entire selling process, including the seller/agent transaction"); <u>see</u> <u>also</u> 3 Hazen, <u>supra</u>, § 12.22.

In addition, as stated above, although private plaintiffs can maintain a cause of action under Rule 10b-5, only the SEC may bring a claim to enforce the prohibitions of section 17(a). <u>See</u> <u>Ernst & Ernst</u>, 425 U.S. at 196 ("Although § 10(b) does not by its terms create an express civil remedy for its violation, and there is no indication that Congress, or the Commission when adopting Rule 10b-5, contemplated such a remedy, the existence of a private cause of action for violations of the statute and the Rule is now well established.") (footnote omitted); <u>Maldonado</u> v. <u>Dominguez</u>, 137 F.3d 1, 6-8 (1st Cir. 1998) (joining a majority of circuits in rejecting a private right of action under section 17(a)).[22]

---

[22] In <u>Maldonado</u>, we based our decision not to imply a private right of action in section 17(a) on our assessment of congressional intent, which we ascertained through the express language of section 17(a) and its neighboring provisions, as well as the statute's legislative history. 137 F.3d at 6-8. Noting that Congress explicitly provided for private causes of action in sections 11 and 12 of the Securities Act of 1933 but not section 17(a), we concluded that because these provisions "address much of the same conduct and benefit the same parties as a potential implied private cause of action, the circumstances [relating to section 17(a)] militate against that inference." <u>Id.</u> at 7-8.

Finally, the degree of scienter required to establish a violation under Rule 10b-5 and section 17(a)(2) differs. To prove a claim under section 17(a)(2), the subsection pertaining to false statements or omissions, the SEC need show only that the defendants acted negligently. Under section 10(b) and Rule 10b-5, however, the SEC must prove that defendants acted with intent, knowledge or a high degree of recklessness. See Aaron v. SEC, 446 U.S. 680, 690-97 (1980); Maldonado, 137 F.3d at 7. This distinction follows closely from the text of the respective provisions. See Aaron, 446 U.S. at 690-97. Deciding the state of mind requirements for section 10(b), the Court set forth in Ernst & Ernst, and confirmed in Aaron, that Congress's inclusion of the terms "manipulative," "device," and "contrivance" in section 10(b) indicated that it sought to limit liability to acts that involved scienter. Ernst & Ernst, 425 U.S. at 197 ("The words 'manipulative or deceptive' used in conjunction with 'device or contrivance' strongly suggest that § 10(b) was intended to proscribe knowing or intentional misconduct."); see also Aaron, 446 U.S. at 690-91. By contrast, the Court has noted that section 17(a)(2) "is devoid of any suggestion whatsoever of a scienter requirement."[23] Aaron, 446 U.S. at 696. Nevertheless, the SEC did

_____

[23] Likewise, section 17(a)(3), because it "focuses upon the effect of particular conduct on members of the investing public, rather than upon the culpability of the person responsible," Aaron, 446 U.S at 697, "does not require a 'showing [of] deliberate dishonesty as a condition precedent to protecting investors.'" Id.

not rely on this distinction in its section 17(a)(2) claims against appellees, alleging in the complaint that they acted with intent, knowledge, or a high degree of recklessness.

The SEC has also invoked two additional statutory provisions against the defendants. The 1934 Exchange Act includes an additional antifraud provision targeted specifically at brokers or dealers operating in the over-the-counter market.[24] See 15 U.S.C. § 78o(c)(1)(A). Section 15(c)(1)(A) of the Act states:

> No broker or dealer shall make use of the mails or any means or instrumentality of interstate commerce to effect any transaction in, or to induce or attempt to induce the purchase or sale of, any security (other than [certain exempted securities]) . . . by means of any manipulative, deceptive, or other fraudulent device or contrivance.

Id.

Finally, the Investment Advisers Act of 1940 "was enacted to deal with abuses that Congress had found to exist in the investment advisers industry." Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 12-13 (1979). Intended to "benefit the clients of investment advisers," id. at 17, Section 206 of the Act "establishes federal fiduciary standards"

(quoting Capital Gains, 375 U.S. at 200).

[24] The over-the-counter market consists of stocks which do not trade on a securities exchange. Louis Loss & Joel Seligman, Fundamentals of Securities Regulation 753 (5th ed. 2004). Because such trading is not centralized, it involves direct transactions between potential buyers and market makers, who deal in a particular security. See id.

enforceable by the SEC. <u>Id.</u> at 17, 24 (quotation marks and citation omitted). The statute reads:

> It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly --
> (1) to employ any device, scheme, or artifice to defraud any client or prospective client;
> (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client . . . .

15 U.S.C. § 80b-6(1)-(2).

## B. The SEC's Claims

In its complaint, the SEC alleges primary and secondary violations of the securities laws by Tambone and Hussey. Primary violations refer to violations committed by Tambone and Hussey themselves; secondary violations, also known as aiding and abetting violations, refer to actions committed by the defendants that aided and abetted other actors who committed primary violations of the securities laws.[25]

---

[25] The text of a securities statute defines the scope of primary liability against a defendant. Primary liability may not attach to conduct that falls short of the explicit statutory language. <u>Central Bank</u>, 511 U.S. at 177-78. Secondary liability involves claims brought against individuals and entities for conduct that substantially contributes to another party's fraudulent behavior, but does not rise to the level of primary liability. <u>See</u> 15 U.S.C. § 78t(e) ("[A]ny person that knowingly provides substantial assistance to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided."). Although both the SEC and private individuals may raise claims of primary liability against a defendant, only the SEC may now bring claims of secondary liability against a defendant. <u>See</u> <u>id.</u>; <u>see</u> <u>also</u> <u>Central Bank</u>, 511 U.S. at 191.

The SEC alleges that Tambone and Hussey, officers of Columbia Distributors, the primary underwriter responsible for directing efforts to sell the Columbia Funds to investors, committed primary violations of section 17(a)(2) of the Securities Act by selling, and offering to sell, the Columbia securities with false prospectuses. As such, they are alleged to have "obtain[ed] money or property by means of [an] untrue statement of a material fact." 15 U.S.C. § 77q(2)(a) (emphasis added).

Additionally, the SEC alleges that Tambone and Hussey made untrue statements of material fact and hence also committed primary violations of section 10(b) of the Exchange Act and Rule 10b-5. See 17 C.F.R. § 240.10b-5(b). As officers of the primary underwriter for the Columbia Funds, appellees had a legal duty to review and confirm, to a reasonable degree, the accuracy and completeness of the prospectus statements they were responsible for distributing. The SEC argues that, by overseeing the distribution of prospectuses which they knew, or were reckless in not knowing, contained false and misleading statements, Tambone and Hussey adopted those statements as their own. The SEC also alleges that, in light of their duties as primary underwriters -- securities professionals engaged in the offer and sale of securities -- Tambone and Hussey impliedly made their own statements to potential investors that they "had a reasonable basis to believe that the key representations in the prospectuses

were truthful and complete." The SEC contends that, because the prospectus statements prohibiting market timing were inaccurate, this implied statement was false, a fact that defendants knew or were reckless in not knowing when they used the prospectuses to sell Columbia Funds.

The same allegations of fraudulent conduct engaged in by Tambone and Hussey form the basis of the SEC's claims of secondary liability under section 10(b), Rule 10b-5, section 206, and section 15(c) of the securities laws. Specifically, the Commission avers that the defendants substantially assisted Columbia Advisors and Columbia Distributor in committing acts of primary liability under the securities laws. By overseeing the distribution of fund prospectuses which they knew (or were reckless in not knowing) were false, the defendants assisted these entities in making false statements to the public in connection with the sale of Columbia securities.

**IV.**

**A. The Scope of Liability under Section 17(a)(2) of the Securities Act**

Although the SEC's complaint raises general allegations of fraud under sections 17(a)(1)-(3), the SEC only appeals the district court's conclusions regarding section 17(a)(2), which addresses untrue statements. To state a claim under section 17(a)(2), which is intended to prohibit fraud by securities sellers, the SEC must allege that Tambone and Hussey have (1)

directly or indirectly (2) obtained money or property (3) by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, such statement having been made (4) with negligence[26] (5) in the offer or sale of any securities. See 15 U.S.C. § 77q; Aaron, 446 U.S. at 696; see generally 3 Hazen, supra, § 12.22 (discussing the elements).

The parties agree that the SEC has adequately alleged elements one, four, and five of the statute, but dispute the scope of conduct covered under elements two and three, and also whether the complaint adequately alleges these two elements. On the question of the scope of actionable conduct, the SEC asserts that section 17(a)(2) extends liability not only to securities sellers who have directly communicated their personal false or misleading statements to potential investors in the course of offering or selling securities to them, but also to sellers who have obtained money or property "by means of" an untrue statement of material fact drafted or approved by another individual. Relying on the statute's passive formulation and its focus on the conduct of securities sellers, the Commission argues that the scope of

---

[26] As we noted above, the SEC does not rely on this diminished state of mind requirement when alleging its claims under section 17(a)(2). The SEC alleges that the defendants acted with knowledge or a high degree of recklessness.

section 17(a)(2)'s prohibition is broader than that of section 10(b) and Rule 10b-5(b), which prohibit a securities actor from "mak[ing] any untrue statement."

The defendants contest this reading of section 17(a)(2). Specifically, they assert that the language "obtain money or property by means of any untrue statement of a material fact" is coterminous with the language of Rule 10b-5(b), which prohibits a securities actor from "mak[ing] a statement." In other words, to be liable under section 17(a)(2), a securities seller must make a false or misleading statement in the course of selling or offering to sell a security to an investor. To support this interpretation of section 17(a)(2), Tambone and Hussey cite several cases that equate the prohibitions of section 17(a) with those of section 10(b) and Rule 10b-5. See, e.g., SEC v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999)("Essentially the same elements [as those required to show a violation of section 10(b) and Rule 10b-5] are required under Section 17(a)(1)-(3) in connection with the offer or sale of a security . . . ."); SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996). Noting that the language of the provisions is nearly identical, and indeed, that section 17(a) served as the model for Rule 10b-5, the defendants assert that it defies logic and language to read section 17(a) as prohibiting a broader range of conduct than Rule 10b-5. The defendants also highlight the SEC's own failure to cite any case

law drawing the distinction that the SEC claims follows from the text of the provisions. Accordingly, the defendants urge us to read section 17(a) and section 10(b) as prohibiting the same range of conduct, and thereby conclude that in order for the SEC to state a claim of primary liability under section 17(a)(2), it must allege that the defendants have made a false or misleading statement.[27]

Without explicitly analyzing the text of section 17(a)(2), the district court adopted the defendants' position, concluding that the provisions were identical for purposes of evaluating the SEC's various claims in this case. Accordingly, the court grouped section 17(a) together with section 10(b) when undertaking its analysis. Citing Wright v. Ernst & Young LLP, 152 F.3d 169, 175 (2d Cir. 1998), a decision applying the language of section 10(b) and Rule 10b-5 in a private securities action, the district court explained that "[i]n order to be liable for a primary violation of Section 10(b) of the Exchange Act and Section 17(a) of the Securities Act, a defendant must have personally made either an allegedly untrue statement or a material omission."[28]

_____

[27] As we discuss below, the defendants then go on to argue that the SEC has failed to allege that the defendants made any false or misleading statement in connection with the sale or purchase of securities. Tambone and Hussey argue that, having failed to state a claim under section 10(b) and Rule 10b-5(b), the SEC has equally failed to state a claim under section 17(a)(2).

[28] Because Wright was a private suit, and section 17(a) claims may be brought only by the SEC, the Second Circuit did not have occasion to address whether the two provisions prohibited the same

-38-

Finding no false statement attributable to either Tambone or Hussey, the court rejected the SEC's theory of liability under both section 17(a)(2) and section 10(b).

When assessing the scope of a statute, we begin, and often end, with its text and structure. See, e.g., Ernst & Ernst, 425 U.S. at 197 ("'[T]he starting point in every case involving construction of a statute is the language itself.'" (quoting Blue Chip Stamps, 421 U.S. at 756 (Powell, J., concurring))); Central Bank, 511 U.S. at 174 ("Adherence to the text in defining the conduct covered by § 10(b) is consistent with our decisions interpreting other provisions of the securities Acts."); see also Aaron, 446 U.S. at 695-97 (parsing the language of section 17(a)(1)-(3) to determine whether scienter is required to establish a violation of each provision). In this context, we are guided by the Supreme Court's oft-recited instruction that courts must construe the language of the securities laws "'not technically and restrictively, but flexibly to effectuate [their] remedial purposes.'" Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 151 (1972) (quoting Capital Gains, 375 U.S. at 195). Additionally, in comparing the text of section 17(a) with that of section 10(b) and Rule 10b-5, the Supreme Court itself has found meaningful distinctions in small variations in

range of fraudulent conduct. Instead, the court focused its analysis on primary liability under section 10(b). For this reason, we discuss Wright at length in Part V, infra.

-39-

language.  See Aaron, 446 U.S. at 695-97 (finding that the provisions, despite their common purpose and similar texts, require different levels of scienter for liability).  We must display the same adherence to the importance of text.

We do not read the case law cited by the defendants as foreclosing the Commission's argument that section 17(a)(2) is broader than section 10(b) and Rule 10b-5(b).  Although we have previously analyzed section 17(a) claims identically to those made under section 10(b) and Rule 10b-5 where the parties agreed that the analysis was the same, see SEC v. Rocklage, 470 F.3d 1, 4 n.1 (1st Cir. 2006), that treatment does not preclude our recognition here that the scope of actionable conduct under the two statutes may be different.  Indeed, this is necessarily so because, as we have noted, the text of the statutes mandate different showings with respect to scienter.  See Aaron, 446 U.S. at 695-97.  Nor are the SEC's arguments foreclosed by Supreme Court precedent or decisions of this circuit.  Cf. Naftalin, 441 U.S. at 778 ("[U]ndoubtedly[,] . . . the [Securities Act and the Exchange Act] prohibit some of the same conduct. . . . But '[the] fact that there may well be some overlap is neither unusual nor unfortunate.'" (quoting SEC v. Nat'l Sec., Inc., 393 U.S. 453, 468 (1969))).

After carefully examining the respective texts at issue, we find the Commission's argument regarding the scope of conduct prohibited by section 17(a)(2) persuasive.  Because section

17(a)(2) was drafted to apply to broker-dealers, its prohibitory language focuses specifically on conduct engaged in by a seller. The statute prohibits an individual from "obtain[ing] money or property by means of any untrue statement." It does not state, however, that the seller must himself make that untrue statement. Indeed, the text suggests that the opposite is true -- that it is irrelevant for purposes of liability whether the seller uses his own false statement or one made by another individual. Liability attaches so long as the statement is used "to obtain money or property," regardless of its source.

In contrast to the "by means of any untrue statement" language of section 17(a)(2), Rule 10b-5(b) renders it unlawful "[t]o make any untrue statement of a material fact . . . in connection with the purchase or sale of any security." As the drafters intended, Rule 10b-5 expands liability to cover all segments of the securities industry, including drafters, auditors, accountants, and distributors. See Central Bank, 511 U.S. at 191. As we stress below, any one of these actors who makes an untrue statement in connection with the purchase or sale of a security may be found primarily liable. See id. However, Rule 10b-5's expansion of coverage beyond the seller of securities is accompanied by a more restrictive statement of the conduct that will suffice to establish liability. The "to obtain money or property by means of any untrue statement" language of section 17(a)(2) is replaced by the requirement in Rule 10b-5(b) that the

-41-

actor "make" an "untrue statement of a material fact . . . in connection with the purchase or sale of any security."

This reading of section 17(a)(2) (that it does not require the defendant to make the false statement at issue), is supported by Congress's inclusion of the phrase "directly or indirectly" in the statutory text of section 17(a). The statute makes it "unlawful for any person . . . directly or indirectly . . . to obtain money or property by means of any untrue statement of a material fact." That a seller may be liable for indirectly obtaining money by means of an untrue statement reinforces the conclusion that the untrue statement at issue need not have been made by the securities seller.[29] Cf. Ballay v. Legg Mason Wood Walker, Inc., 925 F.2d 682, 691 (3d Cir. 1991) ("These words -- 'directly or indirectly' -- convey a legislative intent to encompass all conduct meeting the other elements of a section 17(a) claim."). Therefore, based on our reading of the text of section 17(a)(2), we conclude that this provision covers conduct that may not be prohibited by section 10(b) and Rule 10b-5. Specifically, primary liability may attach under section 17(a)(2)

---

[29] The defendants contend that the phrase "directly or indirectly" modifies the "by the use of any means" clause of section 17(a) and not the conduct described in section 17(a)(2). This reading is not, however, the most natural reading of the provision. Given the text and structure of the provision, including the placement of a comma separating the "by the use of any means" clause from the "directly or indirectly" clause, we read the "directly or indirectly" language to modify the "to obtain money or property" clause at the start of sub-section (2) of the statute.

even when the defendant has not himself made a false statement in connection with the offer or sale of a security.[30]

## B. Applying Section 17(a)(2) to the Conduct of Defendants

Before we assess whether the SEC stated sufficient allegations to support claims of liability under section 17(a)(2) against Tambone and Hussey, we must describe generally the role of an underwriter in the mutual fund process. Our understanding of this role is central to our analysis both of this issue and liability under section 10(b). Principal underwriters, also commonly referred to as distributors, play an essential role in the securities industry, and specifically the mutual fund market. Section 2(a)(40) of the Investment Act defines an "underwriter" as someone who has "purchased from an issuer with a view to, or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect

---

[30] The dissent agrees that we must "give effect" to the "striking divergence" between the language of section 17(a)(2) and Rule 10b-5. However, it also accuses us of "glossing over" this distinction in our discussion of defendants' liability under section 10(b) and Rule 10b-5, _infra_. The dissent fails to understand that, although the statutory provisions are not coextensive, they may comfortably overlap. As the Supreme Court has recognized, this "'fact is neither unusual nor unfortunate.'" _Naftalin_, 441 U.S. at 778 (quoting _Nat'l Sec., Inc._, 393 U.S. at 468). Instead, "[t]he two [statutory provisions] can exist and be useful, side by side." _Edwards_ v. _United States_, 312 U.S. 473, 484 (1941) (discussing the interaction between the mail fraud statute and the Securities Act of 1933). In other words, although it is possible to violate section 17(a)(2) without "making" a statement as required by Rule 10b-5, if defendants have "made" false statements within the meaning of 10b-5, that conduct will always satisfy the "by means of" element of 17(a)(2) liability.

participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking."  15 U.S.C. § 80a-2(a)(40).  Likewise, a "principal underwriter" of a mutual fund is

> [a]ny underwriter who as principal purchases from such company, or pursuant to contract has the right . . . from time to time to purchase from such company, any such security for distribution, or who as agent for such company sells or has the right to sell any such security to a dealer or to the public or both.

Id. § 80a-2(a)(29).

Often affiliated with the mutual fund's investment adviser, in this case Columbia Advisors, the underwriter is thus primarily responsible for the sale and distribution of specified funds.  The underwriter enters into agreements with brokers, dealers, and other intermediaries for the sale of the fund's shares or, alternatively, sells funds directly to the investing public.  See United States v. Nat'l Assoc. of Sec. Dealers, Inc., 422 U.S. 694, 698-99 (1975).  Regardless of how the funds are distributed to the public, the underwriter is responsible for ensuring that the investors or potential investors receive prospectus statements.  See 15 U.S.C. § 77e(b)(2) (requiring that a prospectus be provided prior to the public sale of shares); 17 C.F.R. § 240.15c2-8(h) (requiring a distributor to provide a broker-dealer participating in the distribution or trading of a security with sufficient quantities of the prospectus to ensure

-44-

they reach the investors pursuant to section 5(b) of the Securities Act).

Further, the underwriter is typically responsible for a number of other tasks, including (1) creating and distributing advertising materials and other disclosure documents for the traded securities; (2) ensuring compliance with state and federal offering requirements; (3) identifying potential investors and responding to inquiries; (4) executing purchase and redemption transactions; and (5) providing other services not provided by the fund administrator. Laurin Blumenthal Kleiman & Carla G. Teodoro, The ABCs of Mutual Funds 2007: Forming, Organizing and Operating a Mutual Fund: Legal and Practical Considerations, 1612 PLI/Corp 9, 31-32 (2007). The underwriter is required to register with the SEC under the Exchange Act of 1934, with the states in which it sells securities under the applicable state blue sky laws, and with the National Association of Securities Dealers ("NASD"). Id.

Not surprisingly, the allegations in the complaint are consistent with this general description of the underwriter's role in the mutual fund process. As executives of Columbia Distributor, the principal underwriter for the Columbia Funds, Tambone and Hussey were primarily responsible for distributing the fund prospectuses to potential investors and other broker-dealers. As the SEC states in its brief, "whether selling shares of the Columbia funds directly to investors, or indirectly through other

broker-dealers, Columbia Distributor was required to offer and sell those shares through the use of the fund prospectuses." The SEC alleges that to make these sales, defendants used prospectuses containing statements regarding market timing which they knew, or were reckless in not knowing, were false, and even specifically referred potential investors to those misleading prospectuses to answer any questions the investors might have. Further, both defendants' compensation depended significantly on their sale of Columbia funds. Thus, assuming the allegations are correct, as we must, the defendants' conduct falls squarely within the prohibitions established by section 17(a)(2) of the Securities Act. Tambone and Hussey, in offering and selling securities, obtain[ed] money by means of an[] untrue statement of [] material fact." The section 17(a)(2) claims should not have been dismissed by the district court.[31]

**V.**

## A. The Scope of Liability under Rule 10b-5(b): Making a Statement

Having concluded that the SEC has stated a claim of primary liability against the defendants under section 17(a)(2), we turn to the SEC's allegations regarding section 10(b) and Rule 10b-5. Although the SEC's complaint includes general allegations

---

[31] The SEC, having raised allegations of fraud against the defendants, must also satisfy the pleading particularity requirements of Fed. R. Civ. P. 9(b). We address this issue in Part VI. below.

of fraud in violation of sub-sections (a) and (c) of Rule 10b-5, provisions that address the use of fraudulent practices, schemes, devices, or courses of business, the SEC has not pursued on appeal the district court's dismissal of these claims. Therefore, we limit our discussion to Rule 10b-5(b), which prohibits the making of false statements or omissions in connection with the purchase or sale of any security.

To establish a claim of primary liability under Rule 10b-5(b), a private plaintiff must show (1) a material misrepresentation or omission made by the defendant; (2) a connection between the misrepresentation or omission and the purchase or sale of a security; (3) scienter, specifically that the defendant acted with intent, knowledge, or a high degree of recklessness; (4) reliance by the plaintiff upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. See Stoneridge, 128 S. Ct. at 768; ACA Fin., 512 F.3d at 58. Because this is an SEC enforcement action rather than a private claim, the Commission need not allege any of the elements required to establish a direct link between a defendant's misrepresentation and an investor's injury -- including reliance by the investor on an explicit misstatement, economic loss, and loss causation. See GFL Advantage Fund, Ltd. v. Colkitt, 272 F.3d 189, 206 n.6 (3d Cir. 2001); SEC v. Rana Research, Inc., 8 F.3d 1358, 1363-64 (9th Cir. 1993); Schellenbach v. SEC, 989 F.2d 907,

913 (7th Cir. 1993); SEC v. Blavin, 760 F.2d 706, 711 (6th Cir. 1985); see also Stoneridge, 128 S. Ct. at 769 ("Reliance by the plaintiff . . . is an essential element of the § 10(b) private cause of action.") (emphasis added). As with the SEC's claim under section 17(a)(2), the parties contest the legal standard applicable to the first element of the claim -- that the defendant made a materially false or misleading statement[32] -- as well as whether elements one and three have been sufficiently alleged in the complaint. We first address the question of what it means to "make" a statement for the purposes of Rule 10b-5(b).

The SEC urges us to conclude that the district court erred in finding that defendants, by using false and misleading prospectus statements to sell securities, did not "make" a statement that could render them primarily liable. The Commission argues that, as senior executives of the primary underwriter for the Columbia Funds, Tambone and Hussey had a duty to confirm the accuracy and completeness of the prospectuses they were responsible for distributing to broker-dealers and potential investors. In light of this duty, the SEC contends that the

---

[32] Appellants do not claim that the statements or omissions at issue were immaterial, insisting instead that they did not make them. To satisfy the materiality element, the misrepresentations must be "misleading to a material degree," In re Cabletron, 311 F.3d at 27, signifying that a reasonable investor would believe that they "significantly altered the total mix of information made available," Basic, Inc. v. Levinson, 485 U.S. 224, 232 (1988) (internal quotation omitted).

defendants "made" statements in two ways. First, by using misleading prospectuses despite a duty to review and confirm the accuracy of their contents, the defendants adopted the false statements made by others in the fund prospectuses as their own. The SEC also asserts that by using the prospectuses in this way, defendants made an implied statement of their own to potential investors that they had a reasonable basis to believe that the key statements in the prospectuses regarding market timing were accurate and complete. Because certain statements in the prospectuses regarding market timing were allegedly false, defendants' implied statement was also false. In these two ways, the SEC asserts that defendants' conduct rose to the level of primary liability under section 10(b) and Rule 10b-5(b). On this point, the Commission notes:

> [I]t would be anomalous to shield the person responsible for selling securities from primary liability for using or offering materials that they know, or are reckless in not knowing, are false and misleading simply because the false statements are not ascribed to them. . . . Their role is to act as the intermediary between the issuer of the securities and the investors, to disseminate the prospectus and to encourage investors to purchase the securities on the basis of the prospectus. They are a necessary link in the chain of distribution.

As we explain below, we agree with the Commission that the text of section 10(b) and Rule 10b-5(b), the statutory duties of underwriters, their role in the securities market, and case law support the Commission's argument that Tambone and Hussey made implied statements to investors, within the purview of Rule 10b-

5(b), that they had a reasonable basis to believe that the statements in the prospectuses regarding market timing were accurate and complete. Given this conclusion that Tambone and Hussey made implied statements of their own about the prospectuses, we do not reach the Commission's argument that Tambone and Hussey also made false statements within the purview of Rule 10b-5(b) by adopting the statements of others when they distributed the prospectuses containing false statements on market timing practices.

### 1. Text of Section 10(b)

As with all matters of statutory interpretation, we begin our analysis with the text of the relevant provisions -- here, Rule 10b-5(b) and section 10(b) of the Exchange Act. Although Rule 10b-5 itself offers little guidance on how to define "make," we must also look to the text of section 10(b), its authorizing statute. Ernst & Ernst, 425 U.S. at 197 ("In addressing [the question of the proper scienter requirement under section 10(b) and Rule 10b-5], we turn first to the language of s 10(b), for '(t)he starting point in every case involving construction of a statute is the language itself.'" (quoting Blue Chip Stamps, 421 U.S. at 756 (Powell, J., concurring))); Pinter v. Dahl, 486 U.S. 622, 653 (1988) ("The ascertainment of congressional intent with respect to the scope of liability created by a particular section of the Securities Act must rest

-50-

primarily on the language of that section."). The statutory language is particularly relevant in this case because "[t]he scope of Rule 10b-5 is coextensive with the coverage of § 10(b)," a view which has led the Supreme Court to "use § 10(b) to refer both to the statutory provision and the Rule." Zandford, 535 U.S. 813, 816 n.1 (2002); see also Stoneridge, 128 S. Ct. at 768 ("Rule 10b-5 encompasses only conduct already prohibited by § 10(b)."). In other words, the term "make a statement" in Rule 10b-5 must be read in conjunction with the text of section 10(b), which deems it "unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b) (emphasis added).[33]

The SEC's allegations against appellants are stated in precisely those statutory terms. The SEC avers that defendants used and employed prospectuses containing statements prohibiting market timing practices -- statements that they knew or were reckless in not knowing were false -- in order to sell Columbia Funds. In using the prospectuses in this way, they made implied statements of their own regarding the accuracy and completeness of

---

[33] The Second Circuit has stated that section 10(b) prohibits "conduct involving manipulation or deception," and defined deception as "misrepresentation, or nondisclosure intended to deceive." Ganino, 228 F.3d at 161.

those prospectuses.  These implied statements were false.  As such, they were a "manipulative or deceptive device or contrivance in contravention" of the Commission's rules.[34]  Cf. 17 C.F.R. § 240.15c1-2 (defining "manipulative, deceptive, or other fraudulent device or contrivance" in section 15(c)(1) of the Exchange Act to include "any untrue statement of a material fact.").  The implied statements that Tambone and Hussey made about the truth and accuracy of the prospectuses derive from their statutory duties and their central role in the securities market.

## 2. The Duties of an Underwriter

In assessing whether a defendant has committed a primary violation of the securities laws, courts have examined the defendant's role in the securities market in addition to the specific conduct alleged in the complaint.  These decisions

---

[34] The dissent accuses us of engaging in "sleight of hand" by "us[ing] the broad language of the statute ['use or employ'] to define the obviously narrower language of the rule ['to make']." However, as we discuss above, the Supreme Court has stated that "[t]he scope of Rule 10b-5 is coextensive with the coverage of 10(b)," and also that:

> Rule 10(b)-5 was adopted pursuant to authority granted the Commission under s 10(b).  The rulemaking power granted to an administrative agency charged with the administration of a federal statute is not the power to make law.  Rather, it is the power to adopt regulations to carry into effect the will of Congress as expressed by the statute.

Ernst & Ernst, 425 U.S. at 212-14 (internal quotation marks and citations omitted).  Rule 10b-5(b) implements with some specificity this broad prohibition of section 10(b).  It does not narrow the prohibition.

indicate that a defendant's general responsibilities and statutory duties with respect to the sale and distribution of securities inform the legal significance of specific conduct under Rule 10b-5(b). See, e.g., In re Scholastic Corp. Sec. Litig., 252 F.3d at 77 (analyzing a corporate executive's liability for "making" misleading statements in light of his duties and responsibilities); SEC v. KPMG LLP, 412 F. Supp. 2d 349, 376-77 (S.D.N.Y. 2006) (holding that three engagement partners of an auditing firm who possessed the "ultimate authority to determine whether an audit opinion should be issued" could be primarily liable under the securities laws for misstatements contained in the audit opinion letters, although a fourth defendant, who only acted as a concurring review partner, could not be held primarily liable, as his responsibilities were "not the equivalent of the audit engagement partner's responsibilities"). Indeed, in Wright, one of the "sensible precedents" the dissent accuses us of "relegat[ing] . . . to the scrap heap," and which it praises for its interpretation of Central Bank, see infra, the court acknowledged that "silence where there is a duty to disclose can constitute a false or misleading statement within the meaning of § 10(b) and Rule 10b-5." 152 F.3d at 177 (emphasis added). Just as a defendant's particular role in the securities market may convert his silence into a statement for the purposes of section 10(b), so too may a defendant, by virtue of his role in the market

-53-

and his statutory duties, make an implied statement without actually uttering the words in question.

As already noted, underwriters play an essential role in the sale and distribution of mutual funds to the investing public, which occurs either directly or through other broker-dealers. The text and statutory history of the Securities Act of 1933, and specifically the statute's treatment of underwriters in sections 11[35] and 12,[36] highlight the unique position they occupy in the securities industry. As the Southern District of New York has observed in the context of evaluating several securities claims:

> [I]n enacting section 11, "Congress recognized that underwriters occupied a unique position that enabled them to discover and compel disclosure of essential facts about the offering. Congress believed that subjecting underwriters to the liability provisions would provide the necessary incentive to ensure their careful investigation of the offering."

In re Worldcom, Inc. Sec. Litig., 346 F. Supp. 2d 628, 662 (S.D.N.Y. 2004) (quoting The Regulation of Securities Offerings, Securities Act Release No. 7606A, 63 Fed. Reg. 67174, 67230 (Dec. 4, 1998), 1998 WL 833389). Although underwriters are not insurers

---

[35] Section 11 of the Securities Act "prohibits false statements or omissions of material fact in registration statements" and "identifies the various categories of defendants subject to liability for a violation," including underwriters. Central Bank, 511 U.S. at 179; see also 15 U.S.C. § 77k(a)(5).

[36] Section 12 "prohibits the sale of unregistered, nonexempt securities as well as the sale of securities by means of a material misstatement or omission; and it limits liability to those who offer or sell the security." Central Bank, 511 U.S. at 179; see also 15 U.S.C. § 77l(a).

for offerings, In re Worldcom, 346 F. Supp. 2d at 662, Congress has mandated that they "exercise diligence of a type commensurate with the confidence, both as to integrity and competence, that is placed in [them]." H.R. Conf. Rep. No. 73-152, 1933 WL 984, at *26 (1933). The duty of an underwriter to conduct a reasonable investigation has been explained by the SEC as follows:

> "By associating himself with a proposed offering [an underwriter] impliedly represents that he has made such an investigation in accordance with professional standards. Investors properly rely on this added protection which has a direct bearing on their appraisal of the reliability of the representations in the prospectus. The underwriter who does not make a reasonable investigation is derelict in his responsibilities to deal fairly with the investigating public."

In re Worldcom, 346 F. Supp. 2d at 662-63 (insertions in original) (quoting In re the Richmond Corp., Exchange Act Release No. 4585, 41 SEC Docket 398 [1961-1964 Transfer Binder] Fed. L. Sec. Rep. (CCB) ¶ 76,904, 1963 WL 63647, at *7 (Feb. 27,1963); see also Municipal Securities Disclosure, Exchange Act Release No. 26,100, 41 SEC Docket 1131, 1988 WL 999989, at *20 (Sept. 22, 1988) (observing that the underwriter "occupies a vital position in an offering" and that, by its participation in a sale of securities, the underwriter makes a recommendation that "implies that the underwriter has a reasonable basis for belief in the truthfulness and completeness of the key representations made in any disclosure

documents used in the offerings")[37]; <u>Sanders</u> v. <u>John Nuveen & Co.</u>, 524 F.2d 1064, 1070 (7th Cir. 1975) ("[T]he relationship between the underwriter and its customers implicitly involves a favorable recommendation of the issued security. Because the public relies on the integrity, independence and expertise of the underwriter, the underwriter's participation significantly enhances the marketability of the security." (footnote omitted)).

The case law addressing the duties of underwriters buttresses the SEC's analysis and extends it beyond the traditional context of sections 11 and 12 of the Securities Act. Although sections 11 and 12 specifically concern an underwriter's obligation to ensure the accuracy of registration statements and prospectuses, underwriters are among the securities actors to whom section 10(b) has been applied. <u>See</u>, <u>e.g.</u>, <u>SEC</u> v. <u>Dain Rauscher, Inc.</u>, 254 F.3d 852, 858 (9th Cir. 2001) (finding genuine issue of material fact as to whether underwriter violated Rule 10b-5 by not complying with its "duty to make an investigation that would provide him with a reasonable basis for a belief that the key representations in the statements provided to the investors were truthful and complete."); <u>Flecker</u> v. <u>Hollywood Entm't Corp.</u>, 1997 WL 269488, at *9 (D. Or. Feb. 12, 1997) (finding triable issue of

---

[37] The SEC specifically observes in this Release that the underwriters' "obligation to have a reasonable basis for belief in the accuracy of statements directly made concerning the offering is underscored when a broker-dealer underwrites securities." <u>Id.</u> at 21.

section 10(b) primary liability against underwriter for allegedly false statements that inflated stock prices); In re MTC Elec. Techs. S'holder Litig., 993 F. Supp. 160, 162 (E.D.N.Y. 1997) ("MTC II")(applying the standard of primary liability to underwriters in the context of private allegations of Rule 10b-5 violations); Phillips v. Kidder, Peabody & Co., 933 F. Supp. 303, 315-16 (S.D.N.Y. 1996) (same); In re U.S.A. Classic Sec. Litig., No. 93 Civ. 6667 (JSM), 1995 WL 363841, at *5 (S.D.N.Y. June 19, 1995) (finding that an underwriter's participation in the issuance of a prospectus was sufficient to state a claim of primary liability under Rule 10b-5); In re Software Toolworks, Inc. Sec. Litig., 50 F.3d 615, 629 (9th Cir. 1994) (finding disputed issues of material fact as to whether underwriters' participation in drafting an allegedly misleading letter to the SEC violated section 10(b)); Sanders, 524 F.2d at 1069 (applying Rule 10b-5 to an underwriter alleged to have violated its duty to reasonably investigate the securities it marketed and their issuer); In re Enron Corp. Sec., Derivative & ERISA Litig., 235 F. Supp. 2d 549, 612 (S.D. Tex. 2002) (finding, based on case law highlighting an underwriter's duty to investigate an issuer and the securities it offers to investors, that an underwriter of a public offering could be held liable under section 10(b) and section 11 of the Securities Act "for any material misstatements or omissions in the registration statement made with scienter").

These precedents reflect the unique position of underwriters as securities insiders whose role is "that of a trail guide -- not a mere hiking companion," and who are relied upon by investors for their "reputation, integrity, independence, and expertise." Dolphin and Bradbury, Inc. v. SEC, 512 F.3d 634, 640-41 (D.C. Cir. 2008). Underwriters have access to information of substantive interest and consequence to investors, and a concomitant duty to investigate and confirm the accuracy of the prospectuses and other fund materials that they distribute. See id.; see also Sanders, 524 F.2d at 1071 ("Although the underwriter cannot be a guarantor of the soundness of any issue, he may not give it his implied stamp of approval without having a reasonable basis for concluding that the issue is sound."); Walker v. SEC, 383 F.2d 344, 345 (2d Cir. 1967) ("The Commission is justified in holding a securities salesman chargeable with knowledge of the contents of sales literature.").

In light of this duty to review and confirm the accuracy of the material in the documentation that it distributes, an underwriter impliedly makes a statement of its own to potential investors that it has a reasonable basis to believe that the information contained in the prospectus it uses to offer or sell securities is truthful and complete. The SEC alleges that Tambone and Hussey made such implied statements to investors about timing practices in the Columbia Funds when they knew, or were reckless

in not knowing, that the representations in the prospectuses about timing practices were false. This falsity made their implied statements false. As such, these implied statements were a violation of Rule 10b-5(b).

## B. The Counterarguments of The Defendants and The Dissent

Tambone and Hussey assert that the text of Rule 10b-5(b) and cases analyzing the scope of primary liability under the Rule and section 10(b) require that the Commission allege that they actually made a misrepresentation which is publicly attributable to them, not that they have impliedly done so. They contend that to hold otherwise would be to disregard the Supreme Court's holding in Central Bank and effectively eliminate the boundaries between primary and secondary liability. The dissent takes this position as well.

### 1. Central Bank and its Implications

The issue in Central Bank was whether the indenture trustee for bonds issued by the public Building Authority to finance improvements at a planned development in Colorado Springs could be held liable in a private cause of action under Rule 10b-5 for aiding and abetting a primary violation of the law. Although Central Bank had become aware that the collateral for the bonds

had likely become insufficient to support them, it delayed undertaking an independent review of the original appraisal. Before an independent review could be done, the Building Authority defaulted on a portion of the bonds. The plaintiff raised claims of primary liability against four violators: the Building Authority, which issued the defaulted bonds in question, two underwriters for the bonds, and a director of the development company in charge of providing an appraisal of the bonds. The Building Authority defaulted early in the litigation and the claims against the underwriters were settled. See First Interstate Bank of Denver, N.A. v. Pring, 969 F.2d 891, 893 n.1 (10th Cir. 1992).

The Supreme Court, relying on the text of section 10(b) and Rule 10b-5, concluded that the aiding and abetting claims against Central Bank must be dismissed because private plaintiffs may only bring claims of primary liability, not aiding and abetting liability, against defendants. Nevertheless, the Court noted that "[i]n any complex securities fraud . . . there are likely to be multiple violators; in this case, for example, respondents named four defendants as primary violators."[38] 511

---

[38] Tambone and Hussey urge us to reject the Commission's claims of primary liability because of the SEC's own admission that Columbia Advisors, not defendants, "remained primarily responsible for all representations made" in the fund prospectuses. However, this quotation from Central Bank illustrates the Supreme Court's recognition that a securities fraud will likely involve multiple violators, thereby suggesting that individuals with different

U.S. at 191. Finally, the Court concluded that it is not the identity of a securities actor but his conduct that determines whether he may be liable as a primary violator:

> The absence of § 10(b) aiding and abetting liability does not mean that secondary actors in the securities markets are always free from liability under the securities Acts. Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b-5, assuming all of the requirements for primary liability under Rule 10b-5 are met.

Id.[39]

---

responsibilities could be primarily liable for the same misstatement. 511 U.S. at 191. Therefore, the primary liability of Columbia Advisors does not preclude the primary liability of Tambone and Hussey for their own use of the false and misleading statements contained in those prospectuses. Additionally, in a recent private suit, the Supreme Court confirmed this principle by indicating that defendants Charter Communications, Scientific-Atlanta, Inc., and Motorola, Inc., had all engaged in the fraudulent conduct at issue. See Stoneridge, 128 S. Ct. at 769-70. Although the Supreme Court's statement in Central Bank referred to Rule 10b-5(b), addressing material statements and omissions, and its comment in Stoneridge applied to 10b-5(a) or (c), addressing devices, schemes, artifices, acts, practices, or courses of business, the scope of primary liability in each subsection is governed by the language of section 10(b) of the Exchange Act. Therefore, the Supreme Court's recent confirmation that multiple individuals may be primarily liable under Rule 10b-5(a) or (c) is applicable to its interpretation of Rule 10b-5(b).

[39] See also In re Ikon Office Solutions, Inc., 277 F.3d 658, 666-67 (3d Cir. 2002) (noting that "liability under section 10(b) may extend to secondary actors in the securities markets," and that this is consistent with "the primary purpose of the Securities Exchange Act of 1934," namely, "to protect against manipulated stock prices by imposing strict and extensive disclosure requirements, irrespective of the type of actor that disseminates information to the investing public"); Houston v. Seward & Kissel, LLP, No. 07cv6305(HB), 2008 WL 818745, at *7 n.22 (S.D.N.Y. 2008)

Defendants argue that the Commission's allegations are insufficient to establish primary liability under Central Bank. Similarly, the dissent, while acknowledging that Central Bank does not foreclose the possibility that "persons in the defendants' positions" may be found primarily liable, accuses us of "dismantl[ing] Central Bank's interpretive prescription in its entirety" and "fl[ying] in the teeth of the Supreme Court's circumspect vision of primary liability." The dissent agrees with defendants that our holding is at odds with Central Bank's careful distinction between primary and secondary liability.

There is no conflict between Central Bank and our interpretation of Rule 10b-5. The Court in Central Bank addressed only the question of "whether private civil liability under section 10(b) extends as well to those who do not engage in the manipulative or deceptive practice, but who aid and abet the violation." Stoneridge, 1128 S. Ct. at 775 (Stevens, J., dissenting)(quoting Central Bank, 511 U.S. at 167).[40] As such, the Court did not interpret the phrase "to make" in Rule 10b-5 as it

_____

(noting that even after Central Bank, the implied right of action "continues to cover secondary actors who commit primary violations").

[40] See also Central Bank, 511 U.S. at 176 ("The problem, of course, is that aiding and abetting liability extends beyond persons who engage even indirectly, in a proscribed activity; aiding and abetting liability reaches persons who do not engage in the proscribed activities at all, but who give a degree of aid to those who do.").

applies to primary liability -- which is the question that we address above. See, e.g., SEC v. Wolfson, 539 F.3d 1249, 1258 (10th Cir. 2008) ("Recognizing the dichotomy between primary liability and aiding and abetting liability created by Central Bank, the Commission alleges that [defendants] are primary violators of § 10(b). Thus, the question we confront today is whether the acts [committed by defendants] are sufficient to show that they 'made' the [alleged] material misstatements and omissions . . . such that they can be held primarily liable."); In re ZZZZ Best Sec. Litig., 864 F. Supp. 960, 969 n.11 (C.D. Cal. 1994) (noting that because "[p]laintiff's counsel in that case expressly conceded that the Central Bank of Denver had not itself committed a manipulative or deceptive act[,]" the Court "did not have the opportunity to address the issue of whether [it] could have been found primarily liable under Section 10(b)/Rule 10b-5 had such an allegation been added to the complaint and had the issue of manipulation or deceit not been conceded."); Robert S. DeLeon, The Fault Lines Between Primary Liability and Aiding and Abetting Claims Under Rule 10b-5, 22 J. Corp. L. 723, 729 (1997) ("Although the Central Bank court used the phrase 'make a material misstatement or omission,' the focus of its analysis . . . dealt with the need for a 'material misstatement or omission' or a 'manipulative act' and not on the words 'making' or 'commission.'" (footnote omitted)).

Additionally, Central Bank analyzes the scope of section 10(b) and Rule 10b-5 in a suit brought by a private plaintiff. Although, as the dissent rightly observes, the Court focused on the text of the respective provisions, it also emphasized the element of reliance (which was not satisfied in that case), as well as a set of policy considerations that arise exclusively in the context of private securities litigation. In this respect, Central Bank was primarily a manifestation of the Court's desire to limit the scope of the judicially-implied private cause of action under Rule 10b-5.[41] This is the context that must inform our understanding of Central Bank's "interpretive prescription." We therefore reject the dissent's assertion that Central Bank's conservative approach to its interpretation of Rule 10b-5 in a case brought by a private plaintiff should be stretched beyond its logic to invalidate our interpretation, in an enforcement action, of an element on which the Supreme Court was silent.

2. The Line Between Primary and Secondary Liability

Because aiding and abetting claims were no longer available in private actions after Central Bank, there was more pressure on courts to clearly delineate the outer boundaries of primary liability -- a question the Supreme Court did not address

---

[41] Cf. O'Hagan, 521 U.S. at 664 (noting that Central Bank "concerned only private civil litigation under §10(b) and Rule 10b-5, not criminal liability[,]" and therefore that its "reference to purchasers or sellers of securities must be read in light of a longstanding limitation on private § 10(b) suits.").

in <u>Central Bank</u>. Our sister circuits have crafted two divergent standards to analyze the question: the "bright-line" test, associated most closely with the Second Circuit, and the broader "substantial participation" test, articulated by the Ninth Circuit. We briefly outline these approaches and explain why they are not relevant here, contrary to the arguments of the defendants and the dissent.

Under the most prominent version of the bright-line test, primary liability requires a showing of two elements: first, that an individual has "actually [made] a false or misleading statement," and second, that the statement (or omission) has been "attributed to that specific actor at the time of public dissemination." <u>Wright</u>, 152 F.3d at 175. Thus, with its incorporation of these two elements, the standard purports to draw a "bright-line" between primary and secondary liability. <u>See</u> <u>Shapiro</u> v. <u>Cantor</u>, 123 F.3d 717, 720 (2d Cir. 1997) ("[I]f <u>Central Bank</u> is to have any real meaning, a defendant must actually make a false or misleading statement in order to be held liable under Section 10(b). Anything short of such conduct is merely aiding and abetting, and . . . not enough to trigger liability under Section 10(b)." (quoting <u>In re MTC Elec. Techs. S'holders Litig.</u>, 898 F. Supp. 974, 987 (E.D.N.Y. 1995) ("<u>MTC I</u>"))).[42]

_____

[42] Several other circuits have also adopted the bright-line test, or close variations of it. <u>See</u>, <u>e.g.</u>, <u>Ziemba</u> v. <u>Cascade Int'l, Inc.</u>, 256 F.3d 1194, 1205 (11th Cir. 2001) ("Following the

The first element of the bright-line test -- that the defendant "actually make" the statement at issue -- mimics the text of Rule 10b-5, thereby offering little additional guidance on the precise boundaries of the term "make." The second part of the test -- the public attribution requirement -- follows directly from the element of reliance that is required in a private Rule 10b-5 action. To assert a successful claim under Rule 10b-5, a plaintiff must establish that she has relied on a false and material statement made by the defendant. See supra. This requirement is designed to ensure that the "'requisite causal connection between a defendant's misrepresentation and a plaintiff's injury' exists as a predicate for liability." Stoneridge, 128 S. Ct. at 769 (quoting Basic, 485 U.S. at 243). The attribution requirement is a natural corollary of this

Second Circuit, we conclude that . . . the alleged misstatement or omission upon which a plaintiff relied must have been publicly attributable to the defendant at the time that the plaintiff's investment decision was made."); see also Regents of Univ. of Cal. v. Credit Suisse First Boston (USA), 482 F.3d 372, 386-90 (5th Cir. 2007) (analyzing Central Bank in the context of Rule 10b-5(a) and (c)); In re Charter Commc'ns, Inc. Sec. Litig., 443 F.3d 987, 992 (8th Cir. 2006) ("[A]ny defendant who does not make or affirmatively cause to be made a fraudulent statement or omission, or who does not directly engage in manipulative securities trading practices, is at most guilty of aiding and abetting and cannot be held liable under § 10(b) or any subpart of Rule 10b-5."). The Tenth Circuit, in Anixter v. Home-Stake Prod. Co., 77 F.3d 1215, 1226 (10th Cir. 1996), held that "in order for accountants [to be primarily liable], they must themselves make a false or misleading statement (or omission) that they know or should know will reach potential investors." It has since clarified that, although this is a "bright line" test, public attribution is not required. Wolfson, 539 F.3d at 1260.

principle, because "[a]n individual who relies on a statement that he believes was made by one person cannot then assert a claim against another." SEC v. Collins & Aikman Corp., 524 F. Supp. 2d 477, 490 (S.D.N.Y. 2007).

The facts of Wright illustrate how the bright-line test has been applied. In Wright, the court held that the auditing firm Ernst & Young could not be liable for a misstatement approved by the firm and contained in its client's press release because the release noted that the information was unaudited and, therefore, Ernst & Young's "assurances were never communicated to the public either directly or indirectly." 152 F.3d at 176. The plaintiff had alleged that Ernst & Young knew that its advice would be passed on to investors and that it was understood in the securities market that the press release contained an implicit statement from the auditors that the financial information in the release was accurate. The court rejected plaintiff's arguments as insufficient to support primary liability under Central Bank "because no false or misleading statement was attributed to Ernst & Young at the time of public dissemination." Id. at 178.

In contrast, to allege a primary violation under the substantial participation test, a plaintiff need only show that a secondary actor has "substantially participated" or played "a significant role" in the making of a fraudulent statement and not that he has "made" or created the statement himself. See Howard

-67-

v. <u>Everex Sys., Inc.</u>, 228 F.3d 1057, 1061 n.5 (9th Cir. 2000) ("[W]e have held that substantial participation or intricate involvement in the preparation of fraudulent statements is grounds for primary liability even though that participation might not lead to the actor's actual making of the statements."); <u>In re Software Toolworks</u>, 50 F.3d at 628 n.3 (allowing potential liability for accountants who "played a significant role" in the drafting and reviewing of misstatements); <u>In re ZZZZ Best Sec. Litig.</u>, 864 F. Supp. at 970 (concluding that an accounting firm could be held liable under § 10(b) for its undisclosed participation in the review and preparation of documents released to the public by the company and attributable only to that company). Because of its broad interpretation of the scope of primary liability, the substantial participation test has been criticized as inconsistent with <u>Central Bank</u>'s prohibition of private aiding and abetting liability. <u>See</u>, <u>e.g.</u>, <u>Anixter</u>, 77 F.3d at 1226 n.10 ("To the extent these cases allow liability to attach without requiring a representation to be made by defendant, and reformulate the 'substantial assistance' element of aiding and abetting liability into primary liability, they do not comport with <u>Central Bank of Denver</u>."). As a result, no other circuit has adopted this test to assess primary liability.

Regardless of their relative merits, neither the bright-line nor substantial participation test is relevant to this case.

The substantial participation test evaluates whether one actor can be deemed to have made a statement made or created by another because of the actor's substantial participation in the making or creation of that statement. In this case, as we have explained, Tambone and Hussey are accountable for their own implied statements, making the "substantial participation" inquiry unnecessary. See In re LDK Solar Sec. Litig., ___ F.3d ___, No. C07-05182WHA, 2008 WL 4369987, at *8 (N.D. Cal. Sept. 24, 2008) (declining to address defendants' claim that they had not "substantially participated" in making the fraudulent statements at issue because the court had already determined that they should be "deemed actually to have made those statements.").

Similarly, the bright line test, which is urged upon us by appellees and the dissent, does not address what it means to "make" a statement, as we have described, and it imposes an attribution requirement which, contrary to the position of the district court, is inapplicable to SEC enforcement actions. In the first place, the plain text of the statute does not require attribution. Indeed, it would be ironic to read the requirements of a private cause of action (which include attribution) into the statutory text when section 10(b) and Rule 10b-5 initially applied only to SEC enforcement actions. See, e.g., Stoneridge, 128 S. Ct. at 768 ("Though the text of the Securities Exchange Act does not provide for a private cause of action for § 10(b) violations,

the Court has found a right of action implied in the words of the statute and its implementing regulation."); see also Merrill Lynch, 547 U.S. at 80-83 (noting that the Supreme Court has placed certain limitations on private causes of action under section 10(b) as a result of policy considerations).

Moreover, although public attribution, like direct reliance, is necessary in a private action, public attribution should not be required in a Commission action where there is no need to establish such a causal connection. See, e.g., Wolfson, 539 F.3d at 1259-60 (observing that the attribution requirement "stems directly from the need for private litigants to prove reliance on alleged fraud to succeed on a private cause of action," and, "given [this] unambiguous connection between reliance and attribution," declining to "impose an attribution element in an SEC enforcement action"); Collins & Aikman Corp., 524 F. Supp. 2d at 490 ("If the attribution requirement is motivated by the need to show reliance, which I find to be the more cogent analysis, then it does not apply to actions brought by the SEC."); KPMG, 412 F. Supp. 2d at 375 (in an enforcement action, finding "no reason to impose a requirement that a misstatement [be] publicly attributed to a defendant for liability to attach").

Finally, we reject defendants' assertion that we should require attribution as a matter of policy in order to ensure that

-70-

primary liability and secondary liability are sufficiently delineated from one another.[43] The Supreme Court in <u>Central Bank</u> established the crucial dichotomy between those who, regardless of their role in a securities transaction, make misleading representations themselves, and those who merely assist the culpable actor without personally using or employing any "manipulative or deceptive device" as prohibited by section 10(b). Thus, to distinguish between primary and secondary liability, we must focus on the specific conduct of defendants in light of their role in the securities market, rather than on whether investors specifically relied on their statements. That is precisely what we have done here in deciding that defendants' implied statements that they had a reasonable basis to believe that the market timing disclosures in the prospectuses were truthful and complete fall within the purview of the "make a statement" requirement of Rule 10b-5(b). However, to survive a motion to dismiss, the complaint must still allege facts supporting this theory of liability with the requisite particularity. We turn now to the pleading issue.

**VI.**

## A. Primary Liability

### 1. Section 17(a)(2)

---

[43] <u>But</u> <u>see</u> <u>Lucent</u>, 363 F. Supp. 2d at 724 ("Not only is [the bright-line public attribution] test consistent with the statutory language of Section 10(b), but it more clearly delineates which types of behavior will give rise to primary liability versus secondary liability.").

As we have described, to state a claim under section 17(a)(2), the SEC must allege that Tambone and Hussey have (1) directly or indirectly (2) obtained money or property (3) by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading (4) with negligence (5) in the offer or sale of any securities. See supra Part IV.A. The SEC goes beyond section 17(a)(2)'s relaxed scienter requirement, instead alleging that the defendants acted either knowingly or highly recklessly.

The defendants assert that the SEC failed to state its claims of securities fraud with sufficient particularity. They argue that the complaint was deficient in omitting the specific details of statements in the fund prospectuses that could be deemed misleading as a result of the alleged market timing arrangements. Further, they argue that the majority of the defendants' conduct alleged in the complaint, including their distribution activities and participation in preferred investor arrangements, occurred prior to the adoption of the Strict Prohibition language in the various prospectuses, and therefore cannot provide the basis for a primary violation under the securities laws.

a. General Allegations

We are persuaded that the SEC's complaint satisfies the pleading standards of Rule 9(b). The SEC alleges that Tambone, as Co-President of Columbia Distributor, and Hussey, as Managing Director of National Accounts for Columbia Distributor, were responsible for overseeing the distribution of fund prospectuses in connection with their sale of Columbia Funds. As executives of the primary underwriter, the defendants had a duty to reasonably investigate the fund prospectuses and other disclosure documents released to the investing public to confirm their accuracy and truthfulness.[44]

Tambone's obligation is confirmed by the hundreds of selling agreements allegedly entered into by Columbia Distributor and signed by Tambone, with terms governing the distribution of Columbia Funds by other broker-dealers. Each agreement noted Columbia Distributor's role as the principal distributor of the relevant funds and referred the purchaser to the prospectuses for information on the funds. Each selling agreement expressly represented and warranted that (a) "the [p]rospectus . . . we issue . . . will comply with all applicable state and Federal laws, rules and regulations [and] (b) each [p]rospectus and all

_____

[44] According to the complaint, over half of the total compensation Tambone and Hussey received each year consisted of commissions for fund sales made pursuant to their duties. The defendants do not dispute that they were compensated in part based on their sale of the Columbia Funds. Rather, they contest the degree to which their compensation was linked to the alleged fraudulent conduct in connection with market timing activities.

sales literature we issue will not by statement or omission be misleading . . . ."

The Commission also adequately alleges that the fund prospectuses, which the defendants were responsible for distributing, contained several disclosures concerning short-term or excessive trading practices that could be deemed material misrepresentations. The disclosures, which stated that the individual Columbia Funds were hostile to and did not permit short-term or excessive trading of their shares, could constitute misrepresentations because at the time the disclosures were made, the defendants had approved or had knowledge of arrangements with several preferred entities to allow these prohibited practices.[45] Further, the SEC alleges that defendants knew, or were highly reckless in not knowing, that these statements in the prospectuses were false.

The complaint also avers the defendants' scienter generally, as required by Fed. R. Civ. P. 9(b), alleging that the defendants oversaw the distribution of the various fund prospectuses during 2002 and 2003, when they contained the Strict Prohibition language. Concurrently, both Hussey and Tambone were

---

[45] The prospectus disclosures were also material to the Columbia Funds investors. Given the scope of the alleged trading practices at issue, "there is a substantial likelihood that a reasonable investor would consider [the statements] important in making an investment decision." SEC v. PIMCO Advisors Fund Mgmt. LLC, 341 F. Supp. 2d 454, 464 (S.D.N.Y. 2004); see Basic, 485 U.S. at 231-32.

-74-

aware that preferred customers frequently engaged in short-term or excessive trading practices contrary to the prospectus disclosures. Although the market timing arrangements were typically entered into before the Strict Prohibition language was added to the fund prospectuses, the defendants' distribution of the prospectuses, which was the fraudulent conduct at issue, occurred both before and after the amendments to the prospectuses and at a time when the defendants knew the market timing arrangements were in place. By continuing to distribute these prospectuses without revisions, in the face of such knowledge and a duty to confirm the accuracy of the prospectus statements, the defendants could be found to have acted knowingly or highly recklessly. See, e.g., In re Scholastic, 252 F.3d at 76 ("Where the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts . . . .").

### b. Particular Instances

The SEC states these general claims with sufficient particularity. Its most substantial allegations arise from the arrangement between Ilytat, L.P. and Columbia Distributor. The complaint alleges that Hussey, with Tambone's knowledge, approved an arrangement beginning in 2000 that allowed Ilytat to engage in frequent, short-term trading practices in return for Ilytat's

infusion of $20 million of "sticky assets" into the Newport Tiger Fund. As a result of this arrangement, Ilytat allegedly executed a number of round-trips into and out of the Newport Tiger Fund, the Acorn International Fund, and the Acorn International Select Fund. Specifically, the complaint alleges that Ilytat executed over 30 round-trips during the period from May 2001 through September 2002 in the Newport Tiger Fund, 27 round-trips from September 2000 to December 2001 in the Acorn International Fund, and at least 20 round-trips during the period from July 2000 to June 2001 in the Acorn International Select Fund, all at times when the respective prospectuses contained the Strict Prohibition language expressing the fund's hostility to such practices.

According to the complaint, the defendants had knowledge of Ilytat's arrangement and harmful conduct. By March 2001, Ilytat had been placed, with Hussey's approval, on a list of "Authorized Accounts for Frequent Trading," which contained the preferred customers whose trading practices would not be limited, regardless of their frequency. The same month, Hussey is alleged to have allowed Ilytat to continue its trading practices with respect to the Acorn International Fund specifically, by directing the Columbia Services manager responsible for market timing surveillance to prevent others from taking steps to halt such practices. In 2002, Hussey prevented Columbia Services' market timing surveillance personnel from halting Ilytat's trading

practices, thereby allowing the conduct to continue for almost three additional months.

Tambone allegedly was similarly aware of the market timing practices engaged in by Ilytat, at least with respect to the Newport Tiger Fund. In October 2000 and March 2001, Tambone and Hussey received e-mails from the Newport Tiger Fund portfolio manager informing them of the potential damage that Ilytat's trading practices could inflict on the fund. In response to an e-mail in October 2000, Hussey set forth the guidelines for entering market timing arrangements, which included a requirement that the fund obtain a long-term asset stream "as a quid-pro-quo" for any short-term movements. Tambone was copied on this response. According to the complaint, Tambone was also informed on other occasions by the Tiger Fund portfolio manager and his superior regarding concerns about the negative impact of the frequent trading practices on his fund. Although all of the dated communications discussed in the complaint occurred prior to May 2001, when the Newport Trading Fund added the Strict Prohibition representation, Tambone had been placed on notice that the market timing practices were occurring.

The complaint alleges similar conduct by Tambone and Hussey with respect to Daniel Calugar and the funds in which he invested. In 1999, Hussey approved an arrangement allowing Calugar to make one round-trip per month with his entire

-77-

investment in the Columbia Young Investor Fund and the Columbia Growth Stock Fund. In May 1999, at the beginning of 2000, and again in early 2001, Hussey received information that Calugar was, in fact, engaging in frequent round-trips in these funds and others. Tambone also received an email from Hussey in 2000 apprising him of Calugar's practices. The complaint alleges that Calugar continued to trade through at least August 2001, months after the Strict Prohibition language was adopted in these funds' prospectuses.

The complaint levels additional allegations against Hussey individually. According to the complaint, Hussey approved an arrangement that permitted Signalert to invest in the Columbia Young Investor Fund and the Columbia Growth Fund and to make a number of round-trips in each fund annually. Hussey was subsequently informed in 2000 that Signalert was engaging in these practices and doing so in excess of the agreed-upon levels. After February 2001, when the prospectuses for these two funds were amended to include the Strict Prohibition language, Signalert allegedly made 20 round-trips in the Young Investor Fund and over 20 in the Growth Stock Fund.

c. Summary

The SEC alleges that Tambone and Hussey, as executives of the primary underwriter of the Columbia Funds, were responsible for overseeing the distribution of fund prospectuses to potential

-78-

investors. In that capacity, the defendants allowed the prospectuses, which contained statements that they knew, or should have known, were false, to be disseminated and used to sell the funds, earning money as a commission for those sales. Simply stated, they "obtain[ed] money . . . by means of an[] untrue statement of a material fact." This conduct amounts to a primary violation under section 17(a)(2). Therefore, we find that the SEC has stated claims of primary securities fraud against Tambone and Hussey pursuant to Securities Act Section 17(a)(2) with sufficient particularity to meet the requirements of Fed. R. Civ. P. 12(b)(6), in conjunction with Rule 9(b). Defendants' motions to dismiss the section 17(a)(2) claims should have been denied.

2. Section 10(b) and Rule 10b-5

To state a claim of primary liability under Rule 10b-5(b), the SEC's complaint must allege that the defendants (1) made a materially false or misleading statement (2) in connection with the sale or purchase of securities, and (3) acted with intent, knowledge or a high degree of recklessness. See supra Part V.A.

The same allegations that the Commission made against appellants in the context of its section 17(a)(2) claims also apply to its claims under section 10(b) and Rule 10b-5(b). As the SEC asserts, by using the prospectus statements to sell Columbia Funds, defendants "made their own implied, but false, representations to investors as to the truthfulness and

completeness of the statements made in the prospectuses." These implied statements were a product of their duty "to make an investigation that would provide [them] a reasonable basis for a belief that the key representations in the statements provided to the investors were truthful and complete." If the key representations about the timing practices were false or misleading, as the SEC alleges, this implied statement about the truthfulness and completeness of the statements made in the prospectus was also false. The SEC has sufficiently alleged that defendants, either knowingly or highly recklessly, made multiple false statements. Defendants' motions to dismiss the primary liability claims under section 10(b) and Rule 10b-5(b) should have been denied.

## B. Aiding and Abetting Liability

We turn to the Commission's three claims of aiding and abetting liability against Tambone and Hussey: that they aided and abetted Columbia Advisors' violations of Sections 206(1) and 206(2) of the Advisers Act, Section 10(b) of the Exchange Act and Rule 10b-5, and Section 15(c)(1) of the Exchange Act.

To establish a claim of aiding and abetting liability under the securities laws, the Commission must prove: (1) a primary violation was committed; (2) the defendant was generally aware that his role or conduct was part of an overall activity that was improper; and (3) the defendant knowingly and

-80-

substantially assisted in the primary violation. Cleary v. Perfectune, Inc., 700 F.2d 774, 777 (1st Cir. 1983). If the defendant has a duty to disclose the primary violations, recklessness will suffice to establish scienter. Id.; see also Graham v. SEC, 222 F.3d 994, 1004 (D.C. Cir. 2000) (indicating that recklessness was sufficient to establish a claim of aiding and abetting liability under section 10(b) and Rule 10b-5); SEC v. Peretz, 317 F. Supp. 2d 58, 63 (D. Mass. 2004) (noting that the pre-Central Bank case law regarding aiding and abetting liability survived the enactment of Section 104 of the PSLRA). A defendant's silence or inaction may satisfy the "knowing and substantial assistance" standard if such silence or inaction was consciously intended to further the principal violation. Cleary, 700 F.2d at 778.

1. Section 10(b) of the Exchange Act and Rule 10b-5

Our conclusions regarding secondary liability follow directly from our analysis of the primary liability claims. The SEC has sufficiently alleged an uncharged primary violation[46] of section 10(b) and Rule 10b-5 by Columbia Advisors, which is primarily responsible for writing all statements made in the fund

---

[46] As noted above, the SEC reached a settlement with Columbia Advisors and Columbia Distributor, among others, regarding the allegations in this complaint and therefore has not brought separate actions against these entities.

prospectuses.[47]  It alleges generally that Columbia Advisors knew

and approved of all but one of the market timing arrangements

entered into, and specifically states that Columbia Advisors,

either itself or through various portfolio managers in charge of

the funds at issue, approved the initial agreement with Ilytat,

the arrangement with Ritchie related to the Growth Stock Fund and

the Short Term Bond Fund, as well as the arrangements with

Calugar, Giacalone, D.R. Loeser, and Signalert.  With knowledge of

these arrangements and the subsequent market timing practices

occurring as a result of them, Columbia Advisors continued to make

statements in the prospectuses prohibiting such activities in

these funds.  These allegations support the claim that Columbia

Advisors made the misleading prospectus statements and knew they

were being communicated to investors.

The second element of aider and abettor liability is

satisfied by allegations that the defendants knew, or were at

least reckless in not knowing, that the fund prospectuses they

were distributing contained false or misleading statements.  As we

have emphasized, defendants' positions as officers of Columbia

Distributors imposed upon them a duty to review the accuracy of

---

[47] The SEC alleges that defendants aided and abetted the primary violations of both Columbia Advisors and Columbia Distributor.  Because we conclude that the allegations could support a finding that Columbia Advisors committed a primary violation of section 10(b) and Rule 10b-5, we need not address the claims of primary liability asserted against Columbia Distributor under this provision.

the prospectus disclosures. That duty was particularly relevant here because Tambone and Hussey had knowledge of the market timing arrangements and practices. Therefore, Tambone and Hussey knew or should have known that the prospectuses contained false and misleading statements regarding market timing practices. Further, a review of the relevant prospectuses would have revealed that Columbia Advisors, by drafting the false statements in the prospectuses, was also engaging in primary violations of Rule 10b-5.

Finally, we conclude that the SEC has satisfied the third element of aiding and abetting liability. The defendants' failure to correct the misleading disclosures in the prospectuses, given their duties as underwriters, as well as their use of those prospectuses to sell the funds to investors, substantially assisted Columbia Advisors in its own primary violations. See PIMCO, 341 F. Supp. 2d at 467-68. By distributing the prospectuses written by Columbia Advisors, the defendants communicated the false statements to the investing public, thereby causing Columbia Advisors' primary violation of Rule 10b-5. See Metge v. Baehler, 762 F.2d 621, 624 (8th Cir. 1985) (requiring a showing that "the secondary party [has] proximately caused the violation" and citing, with approval, another court's holding that plaintiff must show "substantial causal connection between the culpable conduct of the alleged aider and abetter and the harm."

(quoting <u>Mendelsohn</u> v. <u>Capital Underwriters, Inc.</u>, 490 F. Supp. 1069, 1084 (N.D. Cal. 1979))).

In reaching this conclusion, we necessarily reject the district court's finding that the defendants did not affirmatively contribute to Columbia Advisors' primary violations. The district court based its conclusion on its determination that the "defendants were not under a duty to disclose the market timing arrangements to investors." However, as explained above, we have rejected that determination. As a result of their position as executives of Columbia Distributor, the defendants had a duty to review and investigate the fund prospectus statements and other materials to determine their accuracy and truthfulness, a duty independent of the fund issuer's responsibility to draft and produce such materials, see Cleary, 700 F.2d at 777 (stating that a duty to disclose may arise "where the law imposes special obligations, as for accountants and brokers"); Chris-Craft Indus., Inc. v. Piper Aircraft Corp., 480 F.2d 341, 370 (2d Cir. 1973) (finding an underwriter liable as an aider and abettor under section 14(e), which prohibits false or misleading statements in connection with a tender offer, for acting recklessly in determining whether a registration statement contained a materially false statement). In light of this duty, defendants' conduct in overseeing the distribution of the false prospectuses

to potential investors amounted to affirmative acts in substantial assistance of the primary violations.[48]

2. Section 206 of the Investment Advisers Act

The SEC also alleges that Tambone and Hussey aided and abetted violations by Columbia Advisors of sections 206(1) and (2) of the Investment Advisers Act. Section 206 of the Advisers Act makes it unlawful for any investment adviser, among other things, "(1) to employ any device, scheme, or artifice to defraud any client or prospective client; [and] (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." 15 U.S.C. § 80b-6; see SEC v. Fife, 311 F.3d 1, 11 (1st Cir. 2002). According to the Act, an "investment adviser" is "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities." 15 U.S.C. § 80b-2(a)(11). Section 206 imposes a fiduciary duty on investment advisers to act at all times in the best interest of the fund and its investors, and includes an obligation to provide "full and fair disclosure of all material facts" to investors and independent trustees of the

---

[48] Having reached this conclusion, we need not address, as the district court did, whether the defendants' inaction was accompanied by a "conscious intent[] to further the principal violation." Cleary, 700 F.2d at 778.

fund. Capital Gains, 375 U.S. at 191, 194, 200-01 (addressing the requirements of an investment adviser pursuant to section 206 of the Advisers Act). An adviser has "an affirmative obligation to employ reasonable care to avoid misleading [his or her] clients." Id. at 194 (quotation marks and footnote omitted). Courts have interpreted sections 206(1) and 206(2) to include essentially the same elements as a section 17(a) claim, except that section 206(1) requires proof of fraudulent intent on the part of the primary actor, whereas the SEC need only allege negligence to state claims under sections 206(2) and 17(a)(2) and (3). See, e.g., PIMCO, 341 F. Supp. 2d at 470.

We conclude that the SEC has alleged with sufficient particularity a primary violation of sections 206(1) and (2) of the Advisers Act. Columbia Advisors, an investment adviser to all of the Columbia Funds, including those that maintained the misleading prospectuses, allegedly failed to satisfy its fiduciary obligations by placing its own interests above those of the funds and their investors. Specifically, the complaint alleges that Columbia Advisors knowingly allowed preferred investors to engage in short-term and excessive trading in the Columbia Funds, and that such trading harmed the interests of long-term shareholders. Despite knowledge of these arrangements, Columbia Advisors knowingly or intentionally failed to disclose the practices, and the conflicts of interest they created. These fraudulent

disclosures or omissions allegedly constituted a "device, scheme, or artifice to defraud" under section 206(1) and a "practice, or course of business which operates as a fraud or deceit upon any client or prospective client" under section 206(2). See PIMCO, 341 F. Supp. 2d at 470.

The second and third elements of secondary liability were also adequately pled in the complaint. Tambone's and Hussey's conduct and state of mind, discussed above, establish with equal force the requisite elements for the SEC's claims under section 206. The defendants allegedly knew, or were reckless in not knowing, first, that Columbia Advisors' representations in the prospectuses regarding market timing were false, and second, that Columbia Advisors was disinclined to stem the harmful market timing practices. In furtherance of the Advisors' deceptive activities, defendants disseminated the misleading prospectuses and allowed the market timing practices to continue. The section 206 claims against defendants should not have been dismissed.

3. Section 15(c) of the Exchange Act

Finally, the SEC alleges that defendants aided and abetted a primary violation of Section 15(c)(1) of the Exchange Act, 15 U.S.C. § 78o(c)(1), by Columbia Distributor. Section 15(c)(1) prohibits a broker-dealer from inducing or attempting to induce the sale of any security by means of a "manipulative, deceptive, or other fraudulent device or contrivance." 15 U.S.C.

§ 78o(c)(1).  The relevant SEC regulation, Rule 15c1-2, 17 C.F.R. § 240.15c1-2, defines "manipulative, deceptive, or other fraudulent device or contrivance" to include

> any untrue statement of a material fact and any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, which statement or omission is made with knowledge or reasonable grounds to believe that it is untrue or misleading.

The elements required to prove a violation under section 15(c)(1) are equivalent to those required under Securities Act section 17(a), including that the defendant acted negligently. See Aaron, 446 U.S. at 707-08 (Blackmun, J., concurring in part and dissenting in part); SEC v. George, 426 F.3d 786, 792 (6th Cir. 2005).

Based on the allegations in the complaint, we conclude that the SEC has adequately stated a primary violation by Columbia Distributor of section 15(c)(1), and related aiding and abetting violations by Tambone and Hussey.[49]  Columbia Distributor, a broker-dealer under the Exchange Act, induced or attempted to induce the sale of various Columbia Funds by means of a misleading statement in the fund prospectuses.  Further, it did so with the requisite level of scienter, ascertained through the mental state

---

[49] We assess whether the SEC has adequately stated a primary violation under section 15(c)(1) by Columbia Distributor rather than Columbia Advisors because the statute applies only to broker-dealers.  The SEC has alleged that Columbia Distributor was a broker-dealer from early 1998 through August 2003.

of its management, namely Tambone. See PIMCO, 341 F. Supp. 2d at 470; 3 Hazen, supra, § 12.8[4] ("[K]nowledge of a corporate officer or agent acting within the scope of authority is attributable to the corporation" (citing In re Atlantic Fin. Mgmt., 784 F.2d 29, 31-34 (1st Cir. 1986) (applying principles of apparent authority in the securities context))).

We need not rehash the allegations constituting the other elements of liability. Tambone's and Hussey's conduct elaborated above satisfies the remaining elements and compels our conclusion that the SEC satisfied its burden under Fed. R. Civ. P. 12(b)(6) with respect to its aiding and abetting claims under section 15(c)(1).

## VII.

Reciting this court's prerogative to affirm a district court's decision on any independently sufficient ground present in the record, Hussey individually raises two additional rationales for affirming the court's decision below to dismiss the SEC's various claims. First, he asserts that the Due Process Clause of the Constitution bars the SEC's claim because he and other securities actors in his position were given insufficient notice regarding the prohibited nature of his alleged activities. Second, he argues that most of the SEC's claims are time-barred because the SEC failed to comply with the five-year statute of limitations period. Specifically, he asserts that many of the

-89-

alleged misstatements in question involved prospectuses issued as long ago as 1998. Further, he claims that because the SEC had knowledge that market timing practices were occurring, but failed to act, it is not entitled to receive the benefit of equitable tolling for its claims.

Neither of Hussey's claims have merit. The Commission seeks with its action to enforce provisions of the securities laws that have been in existence for over half a century. Since their inception, it has been unlawful to offer or sell a securities using a false or misleading statement. The Due Process Clause of the Constitution requires nothing more by way of notice. See, e.g., Hill v. Colorado, 530 U.S. 703, 732-33 (2000) (holding that statute was not impermissibly vague under the Due Process Clause because it provided a person of reasonable intelligence fair notice of what is prohibited).

Regarding Hussey's second claim, the applicable five-year statute of limitations period Hussey invokes applies only to penalties sought by the SEC, not its request for injunctive relief or the disgorgement of ill-gotten gains. See, e.g., SEC v. Diversified Corporate Consulting Group, 378 F.3d 1219, 1224 (11th Cir. 2004) ("When the SEC sues to enforce the securities laws, it is vindicating public rights and furthering public interests, and therefore is acting in the United States's sovereign capacity. This is so even though the SEC seeks disgorgement as a remedy of

the violation . . . .") (per curiam); SEC v. Rind, 991 F.2d 1486, 1490-91 (9th Cir. 1993) (reaching the same conclusion); see also 28 U.S.C. § 2462.  Therefore, those remedies are not barred.

On the issue of penalties, to gain the benefit of equitable tolling, the SEC must establish (1) that there were insufficient facts available to put it on inquiry notice of the possibility of fraud, and (2) that it exercised due diligence in attempting to uncover the factual basis underlying this alleged fraudulent conduct at the point when those facts were available. Maggio v. Gerard Freezer & Ice Co., 824 F.2d 123, 127-28 (1st Cir. 1987).  Here, because of the self-concealing[50] nature of the defendants' conduct, as well as their failure to report any of the alleged preferred investor arrangements to the independent trustees of the Columbia Funds, the SEC did not become aware of the activity until September 2003 when the Columbia entities responded to an inquiry from the Commission. See Cook v. Avien, Inc., 573 F.2d 685, 695 (1st Cir. 1978) (noting that the statute of limitations is tolled until the "plaintiff in the exercise of reasonable diligence discovered or should have discovered the fraud," even if there are no "affirmative acts on the part of defendants" to conceal their conduct from the other party); SEC v.

---

[50] The acts were self-concealing because a reasonable investor would not have been aware that market timing activities were allegedly occurring in several of the Columbia funds, in light of the text of the fund prospectuses that represented otherwise.

<u>Power</u>, 525 F. Supp. 2d 415, 425-26 (S.D.N.Y. 2007). Although Hussey rightly points out that market timing activities were widespread throughout the industry prior to 2003, and therefore the SEC was on notice of such conduct, the basis of the Commission's claims is not the market timing activities per se, but rather the fraud committed upon investors by misleading them about the presence of such activities in the Columbia Funds. As stated in its complaint, the SEC received no information prior to September 2003 that alerted it to any potential fraud or that triggered a duty to inquire whether the defendants or the Columbia entities were engaged in such activity. <u>See</u> <u>Young</u> v. <u>Lepone</u>, 305 F.3d 1, 8 (1st Cir. 2002) (discussing "storm warnings" that would have triggered plaintiff's duty to act). Thus, we conclude that the allegations here support a claim that the five-year statute of limitations period was tolled until September 2003 when the SEC rightly inquired and learned of the defendants' activities.

**VIII.**

We summarize our conclusions:

1. Section 17(a)(2) covers conduct that may not be prohibited by section 10(b) and Rule 10b-5(b). Specifically, primary liability may attach under section 17(a)(2) if the defendant has "in the offer or sale of any securities . . . obtain[ed] money . . . by means of any untrue statement of a

-92-

material fact," even if he has not himself made the untrue statement within the meaning of Rule 10b-5(b).

2. Tambone and Hussey, executives of a mutual fund's primary underwriter, were primarily responsible for distributing fund prospectuses to potential investors and other broker-dealers. To make their sales, they used prospectuses which they knew, or were reckless in not knowing, contained representations about market timing practices which were allegedly false. In doing so, they "obtain[ed] money or property by means of an[] untrue statement of [] material fact," in violation of section 17(a)(2).

3. Tambone and Hussey, executives of a mutual fund's primary underwriter, had a legal duty to confirm the accuracy and completeness of the fund prospectuses that they used in the sale of the mutual fund's securities. As a result of this duty, Tambone and Hussey made implied statements to potential investors that they had a reasonable basis to believe that the statements in the prospectuses regarding market timing practices were accurate and complete. Because certain statements in the prospectuses regarding market timing were allegedly false, defendants' implied statements were also false. These implied statements fall within the purview of section 10(b) and Rule 10b-5(b).

4. The district court erred by requiring the SEC to allege actionable statements publicly attributed to Tambone and

Hussey as a distinct element of its claims of primary liability under section 17(a), section 10(b), and Rule 10b-5.

5. The SEC's claims that Tambone and Hussey committed primary violations of Section 17(a)(2) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5(b), were pled with sufficient particularity to satisfy the requirements of Fed. R. Civ. P. 9(b).

6. The SEC also stated claims of secondary liability in its complaint against defendants Tambone and Hussey under Sections 10(b) and 15(c) of the Exchange Act, Rule 10b-5, and Sections 206(1) and 206(2) of the Advisers Act, and stated such claims with sufficient particularity to satisfy the requirements of Fed. R. Civ. P. 9(b).

The judgment of the district court is reversed; the case is remanded to the district court for further proceedings consistent with this opinion.

So ordered.

**- Concurring and Dissenting Opinion Follows -**

**SELYA**, <u>**Circuit Judge**</u> (concurring in part and dissenting in part).  In recent months, the securities industry has been wracked by a treacherous combination of market forces, overly optimistic risk-taking, and lapses in judgment.  The majority proposes to add to this perfect storm by judicial enlargement of the scope of primary liability for violations of the antifraud provisions of the securities laws.  I have come to conclude that this path-breaking step, though taken in the guise of an interpretation of Rule 10b-5, involves nothing less than a rewriting of that rule.  In the bargain, it stretches the concept of primary liability beyond what I believe the Supreme Court would countenance and allows the SEC to cast a wider net than any court has ever thought possible.

I view this radical departure as an unwarranted usurpation of legislative and administrative authority.  Thus, I respectfully dissent from Part V of the majority opinion.  At the same time, I agree with the majority's holding that the SEC has stated a cognizable claim under section 17(a)(2) of the Securities Act of 1933.  I am nonetheless concerned that the language in which the majority couches this holding is overly broad.  Thus, I concur in the judgment as to that issue without joining Part IV of the majority opinion.

My exegesis begins with the text of the relevant statute and rule.  <u>See</u> <u>Cent. Bank of Denver</u> v. <u>First Interstate Bank of</u>

<u>Denver</u>, 511 U.S. 164, 173 (1994).  Section 10(b) of the Exchange Act of 1934 renders it unlawful for a person "directly or indirectly . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."  15 U.S.C. § 78j(b).  The "in contravention of such rules" language invites clarification of the statute through rulemaking.  The SEC has obliged.

The rule providing clarification in this instance is Rule 10b-5(b).  That provision prohibits "any person" from "directly or indirectly . . . mak[ing] any untrue statement of a material fact or . . . omit[ting] to state a material fact."  17 C.F.R. § 240.10b-5(b).  My disagreement revolves around the proper interpretation of the first element of a Rule 10b-5(b) violation: a material misstatement <u>made</u> by the defendant.

In my view, the verb choice is critical to an understanding of the rule.  Yet the majority casually conflates this carefully chosen verb ("make") with a very different verb ("use") in order to impose primary liability on defendants who have not "made" any misstatements but, rather, are alleged to have used prospectuses that contain misstatements crafted by others. <u>See</u> <u>ante</u> at 51.  The word "make" is not infinitely elastic — and I do not think that it either can or should be interpreted so expansively.  To make a bad situation worse, the majority's

-96-

confusion of these two distinct verbs flies in the teeth of the Supreme Court's circumspect vision of primary liability with respect to the antifraud provisions of the securities laws. Let me briefly sketch the background and then explain the basis for these two conclusions.

In this civil enforcement action, the SEC accuses the defendants of sins of commission, not sins of omission; that is, of making untrue statements of material fact. For present purposes, then, the pivotal word in the rule is "make." Rule 10b-5 does not define that word, and the Supreme Court has not directly addressed its meaning in this setting.[51] Thus, it seems logical to consult the dictionary in order to glean the essence of the word. See, e.g., Perrin v. United States, 444 U.S. 37, 42 (1979).

To "make" means to "act" or "cause to exist, occur, or appear," or "create [or] cause." Webster's Third New International Dictionary 1363 (1993). The SEC charges these defendants, in substance, with passing along to brokers, dealers, and customers prospectuses containing false statements of material

---

[51] The majority correctly acknowledges that Rule 10b-5 cannot be read to sweep more broadly than the statute to which it is appurtenant. Ante at 51. It then turns this axiom inside out and uses the broad language of the statute to define the obviously narrower language of the rule. Ante at 51-52. I do not find either this sleight of hand or the majority's circular attempt to explain it, ante at 51 n.34, persuasive.

fact <u>created</u> by <u>others</u>.[52] To stretch the word "make" to cover that conduct, so that an underwriter's status as such renders him per se liable for others' statements, requires a freewheeling interpretation that disregards both plain meaning and orthodox definitions. There is no principled justification for such an interpretation; in the last analysis, it amounts to a thinly-disguised attempt to rewrite the rule. That is a step forbidden to us as judges. <u>See</u> <u>Robinson</u> v. <u>Shell Oil Co.</u>, 519 U.S. 337, 340 (1997); <u>United States</u> v. <u>Charles George Trucking Co.</u>, 823 F.2d 685, 688 (1st Cir. 1987).

There is a further problem. The majority's freewheeling approach blurs the line that the Supreme Court has taken pains to draw between primary and secondary liability with respect to the antifraud provisions of the securities laws. As Rule 10b-5(b) itself suggests, that line should be kept sharp and clear: a person who does not actually make or affirmatively cause to be made a materially false statement may be held liable as a secondary violator (for aiding and abetting), but he cannot be held liable as a primary violator. <u>See</u> <u>In re: Charter Commc'ns, Inc., Sec. Litig.</u>, 443 F.3d 987, 992 (8th Cir. 2006), <u>aff'd</u> <u>sub</u>

---

[52] Although the SEC's complaint contains some vague allusions that Tambone and Hussey may somehow have participated in drafting the prospectuses, the SEC has focused its primary liability arguments under section 10(b) and Rule 10b-5(b) on the defendants' <u>use</u> of the prospectuses. In accordance with our usual praxis, I deem abandoned arguments that have not been developed on appeal. <u>United States</u> v. <u>Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990).

nom. <u>Stoneridge Inv. Partners, LLC</u> v. <u>Scientific-Atlanta, Inc.</u>, 128 S. Ct. 761 (2008).

<u>Central Bank</u> is of central importance in arriving at this conclusion. The majority labors to downplay the significance of <u>Central Bank</u> by remarking the obvious: that the Court did not address the specific issue with which we are faced. <u>See</u> <u>ante</u> at 61-63. But even though <u>Central Bank</u>'s holding does not explicitly control here, its teachings cannot be so blithely dismissed. While the decision there left open the precise boundaries of primary liability, it remains the beacon by which courts must steer in navigating the interpretive channels that run through the antifraud provisions of the securities laws.

In <u>Central Bank</u>, the Supreme Court laid out its approach to interpreting section 10(b) in private securities actions. 511 U.S. at 167-90. The Court emphasized that a correct interpretation must center on the language of the statute itself. <u>Id.</u> at 175. It admonished that expansive readings of such statutes, based on judicially manufactured policy rationales, should be avoided. <u>Id.</u> at 188-89 (stating that "[p]olicy considerations cannot override our interpretation of the text and structure of the Act").

That prescription comprises the gold standard for courts embroiled in securities fraud litigation. Fairly read, the Court's opinion counsels against superimposing judicial policy

-99-

preferences on unsympathetic language in a statute or rule.  The majority opinion disregards that wise counsel.

Central Bank is informative in another respect as well. The Court specifically held that a private plaintiff cannot maintain an action for aiding and abetting under section 10(b) or Rule 10b-5.  Id. at 191.  As a result, the line between primary violators and secondary violators has become highly significant for those who deal in securities.  That line has ready application here.

There is no need for me to reinvent this particular wheel, for the Second Circuit has gotten it exactly right: "if Central Bank is to have any real meaning, a defendant must actually make a false or misleading statement in order to be held liable under Section 10(b).  Anything short of such conduct is merely aiding and abetting, and no matter how substantial that aid may be, it is not enough to trigger liability under Section 10(b)."  Wright v. Ernst & Young LLP, 152 F.3d 169, 175 (2d Cir. 1998) (quoting Shapiro v. Cantor, 123 F.3d 717, 720 (2d Cir. 1997)); accord Anixter v. Home-Stake Prod. Co., 77 F.3d 1215, 1226-27 (10th Cir. 1996) ("Reading the language of § 10(b) and 10b-5 through the lens of Central Bank of Denver, we conclude that in order for [defendants] to 'use or employ' a 'deception' actionable under the antifraud law, they must themselves make a false or misleading statement . . . .").  The majority opinion in

-100-

this case effectively relegates these sensible precedents to the scrap heap — and it does so without any meaningful support in the case law.[53]

I find further support for a plain-meaning interpretation of Rule 10b-5(b) in a comparison of its text with that of section 17(a) of the Securities Act of 1933. It is common ground that Rule 10b-5 was devised after and in light of section 17(a). See United States v. Persky, 520 F.2d 283, 287 (2d Cir. 1975). For the most part, the rule's provisions mirror the counterpart provisions contained in section 17(a). Compare 17 C.F.R. § 240.10b-5(a) ("to employ any device"), and id. § 240.10b-5(c) ("to engage in any act"), with 15 U.S.C. § 77q(a)(1) ("to employ any device"), and id. § 77q(a)(3) ("to engage in any transaction"). There is a notable difference in language, however, between Rule 10b-5(b) and its counterpart provision, section 17(a)(2). The former uses the word "make," 17 C.F.R. § 240.10b-5(b), while the latter uses the phrase "by means of," 15 U.S.C. § 77q(a)(2). It would be foolhardy to gloss over this striking divergence or to view it as mere linguistic happenstance. It represents a purposeful choice of language and, as such, it

---

[53] To be sure, earlier cases, cited somewhat disingenuously by the SEC, take a less categorical view. See, e.g., Chris-Craft Indus., Inc. v. Piper Aircraft Corp., 480 F.2d 341, 370 (2d Cir. 1973). But these cases preceded the Supreme Court's seminal decision in Central Bank and, thus, have no continuing vitality.

must be given effect.[54]  See United States v. Ahlers, 305 F.3d 54, 59-60 (1st Cir. 2002) (discussing court's obligation to "presume that . . . differential draftsmanship was deliberate"); cf. Nalley v. Nalley, 53 F.3d 649, 652 (4th Cir. 1995) ("When the wording of an amended statute differs in substance from the wording of the statute prior to amendment, we can only conclude that Congress intended the amended statute to have a different meaning."). Doing so bars a court from reading "make" so open-endedly as to distort its meaning and, in the same fell swoop, obscure the obvious distinction between "make" and "by means of."  The majority's rendition ignores this distinction.

In an apparent effort to blunt the force of this reasoning, the majority places weight on the fact that this is an SEC enforcement action rather than a private securities fraud suit.  See ante at 47.  I agree with the majority's conclusion that the absence of any need to show reliance in an SEC enforcement action means that the SEC is not required to

_____

[54] Indeed, the majority notes both the relationship and the linguistic differences between section 17(a)(2) and Rule 10b-5(b) in discussing section 17(a)(2) liability.  See ante at 41-42. There, the majority concedes that the scope of Rule 10b-5(b) is "more restrictive" than that of section 17(a)(2).  Id. at 41.  I fail to understand how the majority can rely on this distinction in adjudicating the dismissal of the section 17(a)(2) claim, but gloss over it in adjudicating the dismissal of the Rule 10b-5(b) claim.  The majority's cursory attempt to explain this inconsistency, ante at 42 n.30, simply does not hold water.  Once the word "make" is construed to mean "implied making" through "use," any principled distinction between "make" and "by means of" is irretrievably lost.

demonstrate public attribution. See SEC v. Wolfson, 539 F.3d 1249, 1260 (10th Cir. 2008) (declining to impose a public attribution requirement in an SEC enforcement action "given the unambiguous connection between reliance and attribution, and the fact that the SEC need not prove reliance"). But for present purposes, this is thin gruel: the absence of any need to prove reliance does not allow a court to dismantle Central Bank's interpretive prescription in its entirety.[55] SEC enforcement actions have no reliance requirement because they are meant to protect the public generally. See Schellenbach v. SEC, 989 F.2d 907, 913 (7th Cir. 1993). That fact does not give the SEC carte blanche to punish under a primary liability framework those whose conduct is not proscribed by the language of the relevant statute or rule. Nor does the absence of a reliance requirement give a court a reason to expand the scope of primary liability for violators of the antifraud provisions of the securities laws.

The majority concludes that "making" can be "implied." Ante at 58. This is exactly the sort of judicial adventurism

---

[55] In this respect, it is instructive to note that after Central Bank courts began to strike down aiding and abetting claims under Rule 10b-5 because "[i]t was difficult to understand how the SEC could bring an aiding and abetting claim under Rule 10b-5 if a private litigant [could] not." Louis Loss & Joel Seligman, Fundamentals of Securities Regulation 1329 (2004). Congress later enacted a different provision to allow the SEC to bring aiding and abetting actions. See id. at 1329 n.37 (citing Sec. Ex. Act § 20(f)). Congress easily could have done the same in the Rule 10b-5 context, but it has not done so.

against which the Central Bank Court warned. While I fully agree that underwriter-executives owe a duty to their clients and to those who purchase securities, a breach of that duty, without more, does not expose those executives to whatever liability the SEC decides to impose. The SEC's attempt in this case to employ Rule 10b-5(b) to punish such a breach impermissibly equates a passive omission — failing to correct a false statement made by another — with the affirmative misconduct that the language of the rule targets.[56]

If more were needed — and I doubt that it is — the precedents are telling. Although this case is one of first impression, the courts of appeals in the aftermath of Central Bank generally have chosen one of two tests, limned by the majority, see ante Part V.B.2, as an aid in drawing the line between primary and secondary liability. Compare, e.g., Wright, 152 F.3d at 173-76 (elucidating attribution test), with, e.g., Howard v. Everex Sys., Inc., 228 F.3d 1057, 1061 n.5 (9th Cir. 2000) (elucidating substantial participation test). I agree with the majority that this case does not present a suitable occasion to choose between these competing tests. My concern, however, is that the

---

[56] I do not mean to suggest that persons in the defendants' positions could never be found primarily liable for a section 10(b) and Rule 10b-5 violation. As the Central Bank Court recognized, 511 U.S. at 191, such a scenario is conceivable. But the allegations in this case, even if true, do not align with the requirements for primary liability.

majority's "implied making" theory of liability captures a much broader range of conduct than either of the existing tests.

There is no need for me to wax longiloquent. This is one of those occasions when the language and structure of a rule and the teachings of the Supreme Court coalesce to signal a particular result. Instead of heeding this signal, the majority prefers to rewrite Rule 10b-5 to achieve a different result. That rewriting is beyond the court's legitimate authority. Moreover, the majority's result, I fear, has the potential to cause a great deal of mischief. At the very least, the majority opinion will garble the law and cause confusion in an industry much in need of clarity.

Because the SEC's complaint fails to state a claim under Rule 10b-5(b) upon which relief can be granted against these defendants, I would affirm the district court's dismissal of that count. To the extent that the majority holds to the contrary, I respectfully dissent.